Hook, Appellee, *v.* Hook, Exr., et al., Appellants.

[Cite as Hook v. Hook (1982), 69 Ohio St. 2d 234.]

(No. 81-580—Decided February 17, 1982.)

*Messrs. Rippner, Schwartz & Carlin, Mr. Timothy M. Flanagan* and *Ms. Angela G. Carlin,* for appellee.

*Messrs. Redmond & Johnson, Mr. Charles C. Redmond, Mr. Tom L. Johnson* and *Mr. Raymond E. Cookston,* for appellants.

*Per Curiam.* In Ohio, there is no public policy, statute or case law which prevents parties to antenuptial agreements from cutting one another off entirely from any participation in the estate of the other upon the death of either. *Troha* v. *Sneller* (1959), 169 Ohio St. 397, 402. The agreement, however, must meet certain minimum levels of good faith, and will be set aside as invalid as a matter of law if the agreement is not fair and reasonable under the circumstances. This court announced the relevant considerations in its syllabus to *Juhasz* v. *Juhasz* (1938), 134 Ohio St. 257, as follows:

"1. An agreement to marry gives rise to a confidential relation between the contracting parties.

"2. An antenuptial contract voluntarily entered into during the period of engagement is valid when the provision for the wife is fair and reasonable under all the surrounding facts and circumstances.

"3. When the amount provided for the wife in an antenuptial contract entered during the existence of the confidential relation arising from an engagement is wholly disproportionate to the property of the prospective husband in the light of all surrounding circumstances and to the amount she would take under the law, the burden is on those claiming the validity of the contract to show that before it was entered into he made full disclosure to her of the nature, extent and value of his property or that she then had full knowledge thereof without such disclosure.

"4. Although the provision made for the intended wife in an antenuptial contract is wholly disproportionate, she will be bound by voluntarily entering into the contract after full disclosure or with full knowledge. * * * "

The law in Ohio, as announced in *Juhasz,* requires the decedent to have fully apprised his prospective spouse of the character and extent of his property prior to entering into an antenuptial agreement which disproportionately limits her share of his estate. The trial court, faced with an attack on the agreement, must consider all facts and circumstances bearing upon the validity of that agreement, and determine whether it is binding and valid.

The threshold consideration when applying the *Juhasz* test is whether the agreement provided the prospective spouse a disproportionate share of the property. In this case, plaintiff-appellee renounced any claims to Donal Hook's property. Absent the agreement, she was entitled to receive one-half the net estate under R. C. 2107.39, as the surviving spouse. It appears that share would be substantial. We conclude, therefore, that the amount of property to be received by the appellee under the terms of the agreement is wholly disproportionate to the value of the decedent's property and to the amount she would take under the law. Accordingly, the agreement will be upheld only if it appears appellee voluntarily entered into the agreement with full knowledge of the nature, extent and value of her prospective husband's property.

Two witnesses, appellee and Raymond Cookston, testified concerning the circumstances surrounding the drafting and execution of the antenuptial agreement. Cookston testified that on December 21, he obtained a figure from Donal Hook approximating the monetary value of his property and from appellee, the approximate monetary value of her property.[2] No itemization of Donal's property was given to appellee. On the 23rd, Cookston recalls meeting with both Donal Hook and appellee, and telling both the effect this agreement would have on their rights in each other's property:

"My observation and understanding as far as not only Donal, but Agnes, was that each party could keep their own property, do whatever they wanted with it, they could leave it by Will to whomever they wanted to. Each of them had no rights in the other's property."

---

[2] The record indicates the witness did not have a specific recollection whether appellee was physically present at the December 21st meeting, or whether he contacted her by telephone to obtain the value of her estate.

Appellee testified that she and Donal went to Cookston's office on December 21 solely to make out a will. She recalled Cookston asking her what her property was worth, and stated that Donal supplied the figure for the value of her property, $80,000. Appellee testified she had no idea the information was for an antenuptial agreement, believing the information was needed for "inheritance tax" purposes.

Appellee testified that on the morning of her wedding, she again went with Donal to Cookston's office, believing it to be for the sole purpose of signing wills. When the antenuptial agreement was placed before her to sign, appellee testified she asked what it was, and Donal Hook responded: " 'Never mind, just sign it. It just means what is mine is mine and what is yours is yours.' "

Appellee further testified that she did not read the document because she "trusted Don and Mr. Cookston and I just signed it. I didn't read it. I didn't have time to read it. I was too nervous."

The antenuptial agreement states, in pertinent part, that "Donal D. Hook is the owner of real and personal property the value of which (after deducting the amount of all encumberances thereon and the amount of his other indebtedness and liabilities) is in excess of Sixty Thousand ($60,000) Dollars, at the date hereof * * * ." In fact, Donal Hook then owned real property valued at $30,000, five savings accounts totalling $28,037.32, six life insurance policies with cash surrender value of $8,443.19—totalling $66,480.51. He also had vested pension death benefits of $20,172.02, which makes the total of the assets $86,652.53, less any indebtedness or liabilities. Prior to the execution of the antenuptial agreement Donal had made appellee the beneficiary of his life insurance policies.

Nowhere does it appear appellee was misled concerning the extent of Donal Hook's assets. Rather, appellee asserts she did not know the significance of what she was signing. However, appellee testified that she was told that the document assured that what was her husband's property before the marriage would remain his, and what was her property would remain hers. This is an accurate statement of the import of the document.

Appellee's assertions that she signed an instrument which she did not comprehend have little force. "Ordinarily, one of full age in the possession of his faculties and able to read and write, who signs an instrument and remains acquiescent to its operative effect for some time, may not thereafter escape the consequences by urging that he did not read it or that he relied upon the representations of another as to its contents or significance." *Kroeger* v. *Brody* (1936), 130 Ohio St. 559, 566.[3]

In the light of all surrounding circumstances, we conclude that appellants, who are claiming the validity of the agreement, demonstrated an adequate disclosure by Donal Hook of the extent of his assets. We find no requirement that the parties to such an agreement itemize their various assets and their worth. In this case, the statement that Donal Hook owned property "in excess of * * * $60,000," together with appellee's knowledge of his insurance policies, satisfies the requirement of full disclosure. Excluding the pension's value, which Donal Hook conceivably could have omitted as "property," the total assets held by him approximated the stated figure. Furthermore, we conclude that the agreement was entered into voluntarily by the parties and that it was fair and reasonable.

Accordingly, the antenuptial agreement at issue here is valid and binding on appellee. The judgment of the Court of Appeals is reversed.

*Judgment reversed.*

CELEBREZZE, C. J., SWEENEY, LOCHER, HOLMES, C. BROWN and STEPHENSON, JJ., concur.

W. BROWN, J., dissents.

STEPHENSON, J., of the Fourth Appellate District, sitting for KRUPANSKY, J.

---

[3] In her answer to the complaint for divorce filed by Donal Hook in Illinois, appellee admitted the existence of the antenuptial agreement at issue here. Her failure to raise the question of its validity at the earlier date infers a past willingness to abide by the agreement and a tacit admission that it was fair and reasonable. Also appellee has an extensive background in legal matters, acting as administratrix of her second husband's estate (Bates), and having dealings in real estate, and rental property. This circumstance indicates appellee fully understands the significance of legal documents.

WILLIAM B. BROWN, J., dissenting. Being ever mindful of the long-established rule that "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence," *C. E. Morris Co.* v. *Foley Construction Co.* (1978), 54 Ohio St. 2d 279, I must dissent. It is my view that sufficient evidence was presented at trial to allow reasonable minds to conclude that the antenuptial agreement was not entered into in good faith and with full knowledge of the assets involved therein.

The testimony of appellee fully supports such a conclusion. Appellee testified that she thought the purpose of the meetings with decedent's attorney, Mr. Cookston, was for will preparation and that there had been no discussion of an antenuptial agreement previously. As to the events of the day upon which the agreement was actually signed, appellee testified that she and the decedent had an appointment to see attorney Cookston 40 minutes before their wedding, that she did not read the papers because she was too nervous and afraid of being late for their wedding, that she thought the agreement dealt with inheritance taxes and that there had never been any discussion as to the nature of the decedent's assets.

Furthermore, appellee gave the following account of the conversation which occurred in Mr. Cookston's office after he gave her some papers to sign:

" * * * I said to Mr. Cookston, 'Are these our Wills?' because he just said, 'Sign here.'

"He said, 'No.'

"I said, 'What is it?'

"He looked at Don. Don said, 'Never mind, just sign it. It just means what is mine is mine and what is yours is yours.' "

The only other witness to testify as to the events surrounding the signing of the agreement was attorney Cookston. Attorney Cookston's testimony, however, did not relate to the events which actually took place on the date of the signing of the antenuptial agreement, for he testified that he had no independent recollection of this specific transaction. Rather, Cookston's testimony related only to his "usual and customary practice."

In essence, the trial court was presented with testimony that depicted two completely different views of the facts of this case. In finding for the appellee, the trial court necessarily found appellee's testimony to be the most credible. It is well established that a reviewing court cannot and should not disturb the findings of a trial judge respecting the credibility of witnesses. (See, *e.g., C. E. Morris Co.* v. *Foley Construction Co., supra.*)

Moreover, the record is void of any evidence that appellee had any independent knowledge of decedent's net worth, that the attorney questioned the parties as to their knowledge of the property interests of each other, or that there was any discussion whatsoever as to property interests.

Thus, in my opinion, sufficient evidence was presented to support the determination by the trier of fact that the antenuptial agreement was invalid, for there was credible evidence that the antenuptial agreement was not entered into in good faith and that the appellee did not voluntarily sign the agreement with knowledge of the nature, extent and value of her husband's assets as is required. (See *Juhasz* v. *Juhasz* [1938], 134 Ohio St. 257.)

For the foregoing reasons, I respectfully dissent.