ROWLAND, Appellant,

v.

ROWLAND et al., Appellees.

[Cite as *Rowland v. Rowland* (1991), 74 Ohio App.3d 415.]

Court of Appeals of Ohio,
Ross County.

No. 1666.

Decided June 4, 1991.

*John H. Farthing,* for appellant.

*Thomas M. Spetnagel,* for appellee Robert O. Rowland, Sr., Administrator of the Estate of Robert O. Rowland, Jr.

*Huffer & Huffer* and *Robert H. Huffer,* for appellees Robert O. Rowland, Sr. and Anita Rowland.

---

GREY, Judge.

This is an appeal from a judgment entered by the Ross County Court of Common Pleas, Probate Division. The trial court found that an antenuptial agreement entered into between Christie Rowland, appellant, and the decedent, Robert O. Rowland, Jr., was valid and enforceable. We reverse.

Christie Rowland assigns the following error, which is phrased as follows:

"Whether considering the totality of the circumstances the court erred as a matter of law in upholding the validity of the antenuptial agreement between appellant and her deceased husband."

On June 6, 1987, Robert O. Rowland, Jr. died intestate as a result of an accidental drowning. He was survived by his spouse, appellant Christie Rowland, their minor child, Heath Z. Rowland, and his parents, appellees Robert O. Rowland, Sr. and Anita Rowland. On June 29, 1987, appellee Robert O. Rowland, Sr. filed an application for authority to administer the decedent's estate.

On July 20, 1987, Christie Rowland filed an amended complaint on behalf of herself in her individual capacity, as well as next friend of Heath Z. Rowland, naming appellees Robert O. Rowland, Sr., in both his individual capacity and his capacity as administrator of his son's estate, and Anita Rowland as party defendants. Christie Rowland prayed for a judgment declaring the antenuptial agreement between herself and the decedent to be invalid.

On December 2 and 7, 1987, a trial was held on Rowland's complaint and the following evidence was adduced. On February 7, 1986, Rowland met the decedent on a blind date. In June 1986, she graduated from Circleville High School. In mid-August 1986, she discovered that she was pregnant. After she told the decedent of her pregnancy, they decided to get married. On August 29, 1986, the decedent met with attorney John Blair to discuss the preparation of an antenuptial agreement.

On or about August 30, 1986, the decedent told Rowland that he had a "paper" she needed to sign. He said that the paper would protect appellees if the marriage ended in divorce, and that it would protect her from the decedent's family's debts if the marriage ended. He also said that if she did not sign the paper, he would not marry her. The decedent told Rowland that he had scheduled an appointment with Blair for them to sign the agreement.

On September 2, 1986, the decedent and Rowland went to Blair's office. Blair showed them a rough draft of an antenuptial agreement which did not include a disclosure of their property. At that time, the only property that appellant owned was her clothing and personal effects. Rowland heard the decedent tell his attorney about the property in which he had an interest as well as the approximate values of each item of property. These figures were added into the antenuptial agreement and after the decedent and Rowland read the agreement, they signed it. The parties to the agreement married three days later.

Robert O. Rowland, Jr. died approximately eleven months after the marriage. The antenuptial agreement noted that a full and complete disclosure of all property owned by the parties had been made to each party and contained an itemized list of the decedent's property, listing his property's net worth as $151,000.

Blair testified that he asked Rowland and decedent if they understood the agreement or had any questions about it. He testified that he did not advise Rowland of her right to independent legal counsel since she seemed to go along with the agreement. Blair testified that Rowland was suffering from no observable physical or mental defect, that she made no complaints about being ill, and that she had the full opportunity to read the entire antenuptial agreement and question him about the agreement. Finally, Blair opined that Rowland realized that she was signing away certain rights to the decedent's property.

Patty Junk, Blair's secretary, testified that appellant appeared to be physically normal, that she had no apparent problems in comprehending or understanding what she was to do, and that she did not appear to be under any threat, duress, or coercion when she signed the antenuptial agreement.

Rowland testified that she was eighteen years old when she signed the agreement and that she was very sick that day due to morning sickness. She said that although she read the entire antenuptial agreement, she did not understand all of the words and that no one explained the agreement to her.

On February 2, 1988, the trial court entered a judgment which determined that the antenuptial agreement was valid and dismissed Rowland's complaint for a declaratory judgment. On February 9, 1988, Rowland filed a Civ.R. 52

request for findings of fact and conclusions of law. On February 29, 1988, Rowland filed a notice of appeal from the trial court's February 2, 1988 judgment.

On March 7, 1988, the trial court overruled Rowland's request for findings of fact and conclusions of law on the basis that the appeal divested it of jurisdiction. In *Rowland v. Rowland* (Oct. 30, 1989), Ross App. No. 1488, unreported, 1989 WL 128897, this court dismissed Rowland's prior appeal and remanded the case to the trial court in order for the court to make the required findings of facts and conclusions of law.

On January 26, 1990, the trial court issued findings of fact and conclusions of law. The trial court concluded that the antenuptial agreement was valid because the parties freely entered into the agreement without fraud, duress, coercion or overreaching. The court further found that there was a full disclosure of the parties' property, that the terms of the agreement did not promote or encourage divorce or profiteering by divorce, and that the parties to the agreement were of full age, in complete possession of their faculties, and able to read, write and fully understand the contents and significance of the antenuptial agreement.

Rowland's sole assignment of error asserts that, when considering the totality of the circumstances, the trial court erred as a matter of law in upholding the validity of the antenuptial agreement between herself and the decedent.

An antenuptial agreement is a contract entered into between a man and a woman in contemplation and consideration of their future marriage, whereby the property rights and economic interests of either the prospective husband or wife, or both, are determined and set forth. *McDole v. McDole* (July 7, 1990), Washington App. No. 89 CA 16, unreported, 1990 WL 105436. These agreements may include provisions concerning the disposition or devolution of property and payments for sustenance upon the death of one or other of the spouses, or provisions for the distribution of property and the sustenance or maintenance of one or other of the spouses, upon a separation or divorce, or any combination of the concerns between the parties. *Gross v. Gross* (1984), 11 Ohio St.3d 99, 11 OBR 400, 464 N.E.2d 500. The provisions at issue in this agreement involve the unilateral release of Rowland's marital rights upon the decedent's death.

Although antenuptial agreements are not *per se* invalid, they must meet certain minimum standards of good faith and fair dealing. *Zimmie v. Zimmie* (1984), 11 Ohio St.3d 94, 11 OBR 396, 464 N.E.2d 142. The parties to an antenuptial agreement are in a fiduciary relationship to one another and,

thus, are under a mandatory duty to act in good faith with a high degree of fairness and disclosure of all circumstances which materially bear on the antenuptial agreement. *Gross, supra,* 11 Ohio St.3d at 108, 11 OBR at 408, 464 N.E.2d at 508. See, also, *Cohen v. Estate of Cohen* (1986), 23 Ohio St.3d 90, 23 OBR 218, 491 N.E.2d 698.

■ *Zimmie, Gross,* and *Cohen, supra,* set out the standard of review for antenuptial agreements. This standard differs from the standard used for ordinary contracts, where a court will not inquire into motive, extent of knowledge, consideration, etc. For antenuptial agreements, there is a different standard. It is set out in *Zimmie,* 11 Ohio St.3d at 98, 11 OBR at 400, 464 N.E.2d at 146:

"Although antenuptial agreements are not *per se* invalid, they must meet certain minimum standards of good faith and fair dealing. If the agreement is fair and reasonable under the circumstances, it will be deemed enforceable."

The trial court did not apply this standard in reaching its decision in this case.

A caveat should be injected here. The *Gross* and *Zimmie* cases are in a line of cases where the standard for antenuptial agreements has changed somewhat. In *Juhasz v. Juhasz* (1938), 134 Ohio St. 257, 12 O.O. 57, 16 N.E.2d 328, the court required that an antenuptial agreement be essentially equitable, by stating in paragraph two of the syllabus:

"An antenuptial contract voluntarily entered into during the period of engagement is valid when the provision for the wife is fair and reasonable under all the surrounding facts and circumstances."

In *Troha v. Sneller* (1959), 169 Ohio St. 397, 402, 8 O.O.2d 435, 437, 159 N.E.2d 899, 903, the court held there was no statutory or public policy prohibition against waiving any particular right arising out of the marriage contract if " * * * it was the plain intention of the parties to accomplish that object."

In *Hook v. Hook* (1982), 69 Ohio St.2d 234, 23 O.O.3d 239, 431 N.E.2d 667, the court backed away from the entirely equitable standard of review of antenuptial agreements. In light of *Troha,* which held that the parties could agree to whatever they wanted, the *Hook* court emphasized a voluntariness standard.

In *Gross, supra,* the court said, at 11 Ohio St.3d at 108, 11 OBR at 409, 464 N.E.2d at 509:

"At the outset it must be restated that upon a judicial review of any such agreement, it must meet the general tests of fairness as referred to previously, and must be construed within the context that by virtue of their anticipated

marital status, the parties are in a fiduciary relationship to one another. The parties must act in good faith, with a high degree of fairness and disclosure of all circumstances which materially bear on the antenuptial agreement."

The change from an entirely equitable standard of review was the basis for the dissents by William Brown, J., in *Hook,* and by Celebrezze, C.J., and C. Brown, J., in *Gross,* but these dissents serve to emphasize what the court was holding. In short, the court said it would not look so much at the fairness of the terms of the antenuptial agreement, but would look at the fairness in making it.

The Supreme Court followed and quoted *Gross* in *Cohen, supra,* and then added, at 23 Ohio St.3d at 92, 23 OBR at 220, 491 N.E.2d at 700:

"The fiduciary relationship and requirement of *good faith and fairness which exists in the making* of the antenuptial agreement does not cease to exist upon performance of that agreement." (Emphasis added.)

The *Gross* case sets out three criteria in paragraph two of the syllabus, but only the first is relevant here, *i.e.,* "(1) if they have been entered into freely without fraud, duress, coercion, or overreaching." *Id.*

■ There was no evidence of fraud here. There *was* evidence of what might be characterized as duress or coercive circumstances: appellant's age, lack of experience, morning sickness, and indeed the pregnancy itself. But those circumstances are issues of fact, and we are bound by the findings of the trial court where there is evidence in the record to support the trial court's decision. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. See, also, *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 550 N.E.2d 178. The trial court's finding that there was not sufficient proof of duress or coercion relied on the well-established presumption that signing means consent and upheld the contract. I believe this is where the trial court erred, by not considering overreaching.

The *Gross* case speaks of "overreaching" and says that "[t]he parties must act in good faith, with a high degree of fairness * * * ." *Id.* at 108, 11 OBR at 409, 464 N.E.2d at 509. The trial court found that there was no overreaching by the decedent and that he acted with a high degree of fairness. The record in this case is absolutely devoid of any evidence to support the trial court's findings and, significantly, the trial court's finding of fact and conclusions of law make no reference to any evidence demonstrating good faith.

There is evidence of overreaching. The agreement was prepared entirely by decedent's counsel, without any input from appellant. The trial court put great emphasis on the testimony of attorney Blair that appellant appeared to understand the agreement, and that she was given the opportunity to ask

questions. To have upheld this agreement, the court would have to have found that Blair, her fiance's attorney, adequately advised her.

Dual representation always presents this kind of problem.

EC 5–15 of the Code of Professional Responsibility states:

"If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation."

There is no evidence in the record that Blair considered that his judgment and ability to adequately explain the terms of the agreement might be impaired.

■ Dual representation is not invalid *per se,* but EC 5–16 goes on to say how these matters should be handled:

"In those instances in which a lawyer is justified in representing two or more clients having differing interests, it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires. Thus before a lawyer may represent multiple clients, he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent."

There is evidence in the record that Blair did not fully explain the potential conflict or recommend that appellant obtain other counsel before signing the agreement:

"Q. I notice in your draft of your pre-marital agreement there is no attorney conflict of interest provision nor is there any provision relating to the fact that Mrs., well, Christie at any time, had a right to any legal counsel. Was anything that you recall explained to her about her right of representation?

"A. I don't remember anything along those lines, but that again is possible and I am sure that if she had asked me I would have told her that she did.

"Q. But you didn't feel that you should advise her that she did have a right at that time to seek counsel?

"A. I feel that everybody really knows that. At least that is my basic experience with people coming into my office, is that people who aren't mentally retarded generally know that they have a right to see a lawyer if they want to."

Appellee asserts that the trial court was justified in finding that Christie's signing was knowing and voluntary because during the time she spent in Blair's office she was given the opportunity to ask questions. Implicit in that contention is the assumption that an eighteen-year-old girl would know what questions to ask.

Blair testified:

"Q. Did you explain in any manner in laymans [sic] terms let's say, the effect of that agreement?

"Specifically let me say with reference to waiver of marital rights upon death of a spouse?

"A. I think that I said that if her husband wanted to make a will leaving her something other than what he had agreed to do in that agreement that he could do so.

"Q. Okay, but there was no discussion about waiver of specific surviving spouse rights that you recall?

"A. No. Not as far as I can recall. Unless she asked a question about it, I answered it *and I don't recall her asking a question about anything.* Although she might have but I don't recall." (Emphasis added.)

Further on there is this testimony:

"Q. Let me ask you this, did you explain to her that by signing this agreement she not only waived her statutory rights as a spouse but also her right to any alimony upon a divorce?

"A. If, I explained it to her from the standpoint that I had her read the agreement and I think that the agreement speaks to those terms."

Blair also testified that he did not know that Christie was pregnant, a factor any attorney would want to know before advising a client on any prenuptial agreement. With a child on the way, the parties' relative interests are considerably different, and with this soon-to-be-born third party, the potential conflict of interest is even greater. But again, there was no disclosure.

We have this testimony from Blair:

"Q. Would you agree with me that it might have been or could have been a better practice to include an attorney conflict of interest in this agreement?

"A. I didn't really think so under the circumstances. You know, it is, hindsight is a wonderful thing but here was a young couple, they were anxious to get married and yet *for some reason* they wanted this agreement or I don't know whether they both wanted it, but *the husband wanted it and the wife seemed to be willing to go along with it.*" (Emphasis added.)

It is not this court's purpose to point out Blair's failure to know the underlying facts or reasons for making the agreement, nor his failure to advise Christie of the rights she was giving up in this agreement. Rather, we emphasize the above facts to show that the trial court could not have found, using the standard set out in *Gross*, that these facts establish "[t]he fiduciary relationship and requirement of good faith and fairness which exists in the making of the antenuptial agreement * * * ." *Cohen, supra*, 23 Ohio St.3d at 92, 23 OBR at 220, 491 N.E.2d at 700.

There was testimony from Christie Rowland that she really did not understand the agreement, and the trial court was free to believe or not believe her. But in a case involving a prenuptial agreement, a court must go on to find evidence of good faith and fair dealing. The trial court did not so find, but instead relied on the ordinary standard for contractual consent when it found in Conclusion of Law No. 6:

"The parties to the agreement were of full age, in complete possession of their faculties, able to read and write and fully understand the contents and significance of the document."

This case cannot be reconciled with *Zimmie*, *Gross*, or *Cohen, supra*. Even in *Hook, supra*, the case closest on the facts here, the court noted that Hook entered into the agreement with full knowledge and that:

"Also appellee has an extensive background in legal matters, acting as administratrix of her second husband's estate (Bates), and having dealings in real estate, and rental property. This circumstance indicates appellee fully understands the significance of legal documents." *Id.*, 69 Ohio St.2d at 238, 23 O.O.3d at 241, 431 N.E.2d at 670, fn. 3.

Not even by *Hook* standards can this prenuptial agreement be upheld.

If Christie Rowland had been handed this agreement and told to sign, as in *Hook*, perhaps the trial court would have been justified in holding that she was bound by the agreement, and any failure to read or understand it was hers. However, in this case appellant's signature was obtained only after being "advised" in Blair's office, a procedure in clear violation of the Canons of Ethics. This pro forma exercise cannot be proof of Christie's knowing, intelligent and voluntary consent to the agreement, but only proof of overreaching as a matter of law.

Christie Rowland's assignment of error is well taken and is sustained. The judgment of the trial court is reversed and the matter is remanded to the trial court with instructions to enter a finding that the antenuptial agreement between Christie and Robert O. Rowland, Jr. is invalid.

*Judgment reversed*
*and cause remanded.*

HARSHA, J., concurs in judgment only.

STEPHENSON, P.J., dissents.

STEPHENSON, Presiding Judge, dissenting.

I respectfully dissent. After reviewing the record in the cause *sub judice*, I am persuaded that there is sufficient evidence to support the trial court's judgment upholding the validity of the antenuptial agreement. Furthermore, I disagree with a number of the contentions made in the principal opinion and feel compelled to address them in part.

In reversing the judgment below, the principal opinion begins its analysis by discussing the element of "overreaching." First, it is stated that "the trial court erred, by not considering overreaching." This is patently erroneous. Conclusion of Law No. 3, attached to the court's findings of fact filed January 26, 1990, explicitly provides the following:

"3. The parties freely entered into the agreement without fraud, duress, coercion or *overreaching*." (Emphasis added.)

The principal opinion then goes on to clarify the concept of "overreaching" by explaining that it requires the parties to "act in *good faith*, with a high degree of fairness * * *." (Emphasis added.) While that may be true, such conclusion must be read in light of the definition of "overreaching" given by the Supreme Court in *Gross v. Gross* (1984), 11 Ohio St.3d 99, 105, 11 OBR 400, 406, 464 N.E.2d 500, 506, as being a situation where "one party by artifice or cunning, or by significant disparity to understand the nature of the transaction, [acts] to outwit or *cheat* the other." (Emphasis added.) In my opinion, an attempt to "cheat" an individual would require much more than the showing of a mere absence of "good faith."

More significant, however, is the principal opinion's contention that the trial court made no finding of good faith in the execution of the antenuptial agreement and that there was no evidence which would have supported such a finding. In effect, the principal opinion appears to place the burden of proving the validity of that agreement upon the party seeking to uphold it rather than the party who bought the action to challenge it. I am not persuaded that this is the law.

Ohio law has long provided, in most instances, that the party which asserts an issue or claim for relief will carry the burden of proving that which he asserts. See, *e.g.*, *McFadden v. Breuer Transp. Co.* (1952), 156 Ohio St. 430, 433, 46 O.O. 354, 356, 103 N.E.2d 385, 387; *Martin v. Columbus* (1920), 101 Ohio St. 1, 5, 127 N.E. 411, 412; *Ginn v. Dolan* (1909), 81 Ohio St. 121, 127, 90 N.E. 141, 142. With respect to challenging the validity of antenuptial agree-

ments, there is some early case law to the effect that a portion of this burden may lie with the party seeking to uphold the validity of such agreement.[1]

Whatever the earlier state of the law, however, the Ohio Supreme Court recognized, in 1984, that changing policy and trends in marriage and divorce across the country had made such agreements desirable as a means "to promote or facilitate marriage * * *." *Gross, supra,* 11 Ohio St.3d at 105, 11 OBR at 406, 464 N.E.2d at 506. Thus, new criteria were set forth by the court to gauge the validity of such agreements. *Id.* at paragraphs two and four of the syllabus. Although the Supreme Court never discussed who would bear the burden of proof in an action challenging these agreements, it did hold that, with respect to the element of unconscionability, the burden was on the party asserting an unconscionable effect. *Id.* at 109, 11 OBR at 409, 464 N.E.2d at 509.

It would, therefore, seem logical to assume that the burden also lies on that party challenging the agreement to show the *absence* of any other element required to sustain its validity. This would also be the more just result where, as with any death-operative antenuptial agreement, the only other party to the agreement is deceased and unable to present evidence to uphold it. Moreover, the growing trend among jurisdictions which are now presuming these agreements to be valid is to place the burden of proof on the party challenging them. See, *e.g., In re Estate of Peterson* (1986), 221 Neb. 792, 795, 381 N.W.2d 109, 112; *Evered v. Edsell* (Fla.1985), 464 So.2d 1197, 1199; *Gant v. Gant* (1985), 174 W.Va. 740, 329 S.E.2d 106, 116; *Newman v. Newman* (Colo.1982), 653 P.2d 728, 736; *In re Estate of Burgess* (Okla.App. 1982), 646 P.2d 623, 626; *Counts v. Benker* (1982), 416 Mich. 681, 690, 331 N.W.2d 193, 196; *Sunshine v. Sunshine* (1976), 51 A.D.2d 326, 327, 381 N.Y.S.2d 260, 262, affirmed *sub nom. In re Sunshine* (1976), 40 N.Y.2d 875, 389 N.Y.S.2d 344, 357 N.E.2d 999.

---

**1.** See, *e.g., Juhasz v. Juhasz* (1938), 134 Ohio St. 257, 12 O.O. 57, 16 N.E.2d 328, at paragraph three of the syllabus, wherein the court held that the burden of proving the validity of an antenuptial agreement was placed upon the party seeking to uphold it whenever the amount of property given to one spouse was "wholly disproportionate" to the property owned by the other spouse. Subsequent decisions, however, strictly construed this principle, and it was held that the burden to prove validity would not be placed on the party seeking to uphold the agreement unless there actually was a "disparity" between the value of the estate and the property taken by the spouse and the burden remained on that spouse to demonstrate such "disparity." See, *e.g., Herman v. Soal* (1942), 71 Ohio App. 310, 311–312, 26 O.O. 188, 188–189, 49 N.E.2d 109, 110; *Rocker v. Rocker* (1967), 13 Ohio Misc. 199, 214, 42 O.O.2d 184, 192, 232 N.E.2d 445, 455. The syllabus in *Juhasz,* however, must be read in light of the fact that the fairness standard employed in that case has, subsequently, been replaced by those tests set forth in *Gross v. Gross* (1984), 11 Ohio St.3d 99, 11 OBR 400, 464 N.E.2d 500, at paragraph two of the syllabus.

Thus, I disagree with the implicit contention of the principal opinion that it was incumbent upon appellee to have demonstrated, below, that the antenuptial agreement was executed in good faith. Rather, the burden should have been on appellant to demonstrate the absence of good faith and any failure to carry that burden would only serve to strengthen the argument for validity. This argument is academic, of course, inasmuch as the determinative question with regard to "overreaching" is, as stated previously, not good faith *per se* but whether the deceased acted to "outwit" or "cheat" appellant. Nevertheless, I believe the burden of proving such factors rested squarely on appellant.

I also disagree with the principal opinion's finding of "overreaching" in the consummation of the agreement. To be sure, there was sufficient evidence presented below to support such a finding. However, the principal opinion ignores all evidence to the contrary. For instance, I would note the following admissions made by appellant during the proceedings below:

"Q. Okay, Are you saying that Robert Rowland, Jr. *tricked you into signing this agreement* and you didn't know what you were signing?

"A. *No I don't believe he did.* I can't get inside his mind and see why he made me sign it, but I think his parents had something to do with it because he loved me and he wouldn't have wanted me to go through any pain.

"* * *

"Q. Were you threatened, was [your] life in danger if you didn't sign the paper?

"A. No.

"Q. *Were you under any duress* that somebody else was going to be harmed in any way if you didn't sign this paper?

"A. What is duress?

"Q. Well, under force or a fear that something bad was going to happen if you didn't sign the paper?

"A. *No,* just what Rob told me about his parents, about divorce." (Emphasis added.)

This testimony is clearly sufficient to support the trial court's conclusion that there had been no overreaching. An appellate court should not overturn the judgment of a lower court where that judgment is supported by some competent, credible evidence. *Vogel v. Wells* (1991), 57 Ohio St.3d 91, 96, 566 N.E.2d 154, 159; *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. While the principal opinion may recognize this fundamental doctrine of appellate review, it has nevertheless

reassessed and reweighed the evidence in order to reverse the trial court on this issue.[2]

In determining that overreaching had occurred, the principal opinion relies heavily on the fact that "[t]he agreement was prepared entirely by decedent's counsel, without any input from appellant." I find no particular relevance in this factor *alone*. Legal documents (*e.g.*, notes, mortgages, contracts, etc.) are frequently prepared by one party's attorney and then executed by another party who has not sought legal counsel. That being the case, nobody seriously contends that those documents should be held invalid *per se* merely because one side was unrepresented by counsel. The same should be true with antenuptial agreements. Of course, the parties to such an agreement are in a fiduciary relationship to one another, *Gross, supra,* 11 Ohio St.3d at 108, 11 OBR at 408, 464 N.E.2d at 508, whereas most parties in an ordinary contractual setting are not. Nevertheless, I am not persuaded that the mere absence of counsel, without more, is sufficient to make the agreements invalid as a matter of law.

Furthermore, the record is replete with evidence to show that appellant, even if not fully cognizant of specific terms in the agreement, was at least put on notice that important legal rights were involved and that independent counsel should be consulted. For instance, testimony reveals that prior to going to Mr. Blair's office to execute the agreement, appellant had been advised by her "Aunt Susan" not to sign anything. Further testimony reveals that, upon returning from the attorney's office, the decedent's mother was requested by appellant not to inform anyone on appellant's side of the family that the agreement had been executed. During her own testimony, appellant made the following admissions:

---

2. For similar reasons, I am unpersuaded by any argument concerning appellant's alleged lack of understanding of the antenuptial agreement. To be sure, a significant disparity in understanding of that document may go to the issue of overreaching. See *Gross, supra,* at 105, 11 OBR at 405, 464 N.E.2d at 506. However, I believe that such an issue is best left for the determination of the trier of fact. This court is supposed to proceed on a presumption that the findings of the trial court are correct because that court is better able to gauge the witnesses' demeanor, gestures and voice inflections in weighing the credibility of their testimony than we are. See *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 138, 566 N.E.2d 1181, 1184; *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276. In reviewing appellant's testimony, it is clear that her credibility might have played a significant role in the court's decision to uphold the agreement. In particular, appellant's numerous questions indicating that she did not understand certain words used in questioning her (*e.g.*, property, provisions, statute, etc.) as well as her apparently belligerent attitude to counsel during cross-examination may have influenced the court in its determination that she was not so lacking in understanding of the agreement as she would have us believe.

"Q. Now between the time that Rob had told you that he wanted you to sign a paper and this particular day you were driving to Mr. Blair's office, had you discussed with anyone of anything about a paper or agreement?

"A. No he told me not to. *He said especially don't tell my mom and dad because they won't let us get married* and he said don't talk to anybody about it because it is not something you go around talking to people about.

"* * * *

"Q. Do you remember stating that Rob told you that if the pre-nuptial agreement or the paper was not signed that he could not get married?

"A. Right, he said, I was joking around with him, I don't know if he was joking ... or not, but I said well what if I don't sign this then, and he said well then I can't marry you."[3] (Emphasis added.)

In sum, this evidence clearly shows that appellant was aware that important legal rights were involved in this agreement, even if she was not able to understand the specific terms thereof. Accordingly, independent counsel should have been sought. Appellant should not now be permitted to seek refuge behind her own inability to understand the specific provisions of the agreement when she knowingly neglected to have those provisions explained to her.

The principal opinion also utilizes this absence of legal representation to conclude that John Blair, the attorney who drafted the agreement, engaged in a "dual representation" of both parties and thereby effected an overreaching of appellant. I find nothing in the record which leads to this conclusion.

Generally, an offer and acceptance of employment is necessary to create the relationship of an attorney-client representation. See *State ex rel. Shroder v. Shay* (C.P.1906), 3 Ohio N.P. (N.S.) 657, 669, 16 Ohio Dec. 446, 455. I can discern no indication from the transcript in this case that appellant ever retained the services of Blair. Indeed, while testifying, appellant made

---

**3.** Both the principal opinion and appellant's brief make reference to this testimony that the decedent would not marry appellant unless she signed the antenuptial agreement. Although no particular reliance is placed on this testimony, I would parenthetically note that I am not persuaded that such action would constitute "duress" or "overreaching." It is well-settled law that it does not constitute duress for an individual to do that which he has a legal right to do. *Andres v. Perrysburg* (1988), 47 Ohio App.3d 51, 54, 546 N.E.2d 1377, 1381; *Gallagher v. Lederer* (1949), 86 Ohio App. 181, 183, 41 O.O. 29, 30, 90 N.E.2d 412, 413; *Bartlett v. Richardson Co.* (1927), 27 Ohio App. 263, 271, 161 N.E. 403, 405. Inasmuch as an individual has a right to not get married, a refusal to proceed with the wedding unless the agreement was signed would not constitute duress. *Liebelt v. Liebelt* (App.1990), 118 Idaho 845, 848, 801 P.2d 52, 55. Furthermore, such a threat, if nothing else, "should put the potential spouse on notice that the agreement was of a serious nature and should be dealt with in a serious manner." *Id.*

several references to Blair as having been the decedent's attorney. Further, testimony by Patty Junk, Blair's legal secretary, suggests that the decedent as well as appellee, Robert O. Rowland, Sr., had retained Blair to represent them in past legal matters. This indicates a sustained relationship between Blair and the Rowland family but lends no credence to a theory that he had also been retained to protect appellant's interests. Even assuming, *arguendo*, that there had been a dual representation, I am not persuaded that this would have caused the agreement to be invalid.

Finally, the principal opinion declares that "[t]o have upheld this agreement, the court would have to have found that [Mr.] Blair * * * adequately advised her." No such criterion, however, is required by the Supreme Court as a specific foundation for upholding these agreements. See *Gross, supra*, at paragraph two of the syllabus. Although the principal opinion states that the absence of independent representation will not render these agreements invalid *per se*, it nonetheless places great, if not controlling, significance on that factor.

Although there appears to be little Ohio case law on the subject, I note that at least one neighboring jurisdiction has recently rejected this very proposition. See *Simeone v. Simeone* (1990), 525 Pa. 392, 401, 581 A.2d 162, 166. Instead, I believe the better approach would be to regard the presence, or absence, of independent legal counsel as only one of several factors to consider in determining whether there has been any duress, coercion or overreaching. See *McHugh v. McHugh* (1980), 181 Conn. 482, 487, 436 A.2d 8, 12; *In re Marriage of Ingels* (1979), 42 Colo.App. 245, 249, 596 P.2d 1211, 1214. Were it otherwise, and independent legal representation was required in order to uphold these agreements, then a knowledgeable prospective spouse could always make an argument to later invalidate such an agreement by not retaining counsel. This would clearly run counter to the Supreme Court's policy of allowing valid agreements as a means to promote or facilitate marriage. *Gross, supra*, 11 Ohio St.3d at 105, 11 OBR at 405, 464 N.E.2d at 506.

In conclusion, I reemphasize that, in my view, there is sufficient evidence to support the finding of the principal opinion that overreaching had occurred in consummating the agreement; however, there is also sufficient evidence to support the trial court's judgment to the contrary. That being the case, this court should not substitute its own evaluation of the circumstances for that of the trial court. Moreover, by restricting its inquiry of "overreaching" solely to the element of good faith, and by imposing the burden of proof upon appellee, the principal opinion disregards much of the pertinent evidence which supports the judgment below. Therefore, I respectfully dissent.