# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## CARROLL COUNTY

SIMONA MARIAN-MALONEY,

Plaintiff-Appellant,

v.

THOMAS MALONEY,

Defendant-Appellee.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 CA 0963**

---

Domestic Relations Appeal from the
Court of Common Pleas, General Division
of Carroll County, Ohio
Case No. 2021 DRB 29857

**BEFORE:**
Carol Ann Robb, David A. D'Apolito, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Arnold F. Glantz*, Glantz Law offices, for Appellant Simona Marian-Maloney and

*Atty. Stanley R. Rubin,* for Appellee Thomas Maloney.

Dated: December 6, 2023

**Robb, J.**

**{¶1}** Appellant Simona Marian-Maloney (the wife) appeals the decision of the Carroll County Common Pleas Court denying her motion to invalidate a prenuptial agreement entered with Appellee Thomas Maloney (the husband). She contends the agreement was not enforceable due to duress, coercion, or overreaching. For the following reasons, the trial court's judgment is affirmed.

STATEMENT OF THE CASE

**{¶2}** The wife filed for divorce in August 2021 after 20 years of marriage. The husband attached the parties' prenuptial agreement to his answer and counterclaim. The agreement was executed by the parties on May 10, 2001 and stated in pertinent part: each party relinquished spousal rights to the property and estate of the other; all real and personal property owned by each before the marriage or thereafter acquired would remain the personal estate of each as if no marriage had been entered; but property acquired during the marriage would become marital property if titled jointly. The attached asset list disclosed the husband's $485,000 in investments, $18,500 in debts, and $100,000 in anticipated employment income. The asset list showed the wife had $61,500 in assets (including a house worth $50,000), $2,100 in debts, and no anticipated income that year.

**{¶3}** In March 2022, the wife filed a motion to invalidate the prenuptial agreement. At the hearing on the motion to invalidate the agreement, the parties testified they met at her brother's house and started dating a year later in 1999 (approximately two years before they got married). She was a secretary, and he was an engineer. The wife had been married before and had two children, one of whom was an adult at the time. The husband had been divorced three prior times and had two adult children. At the end of 2000, the husband's new job required him to move from Alliance, where they both lived, to a rental house two hours away. The wife testified the husband proposed to her shortly after Thanksgiving of 2000. His testimony disputed this, stating the wife wanted to get married immediately after her planned move to his house but he told her he wanted to wait and see how things went. (Tr. 65). The wife and her thirteen-year-old child moved

in with the husband in January of 2001. She testified they initially contemplated renting out her Alliance house to provide her with income.

{¶4} The wife testified the husband first spoke to her about a prenuptial agreement in February or March of 2001. (Tr. 8). At the time, he was 56 years old, and she was 39 years old. She acknowledged meeting with the attorney who drafted the agreement at his office. He advised her to consult with an attorney after explaining he was not representing her. (Tr. 9-10, 26-29). The wife said the husband did not believe they needed a second attorney, noting he and his third wife only used one attorney for their prenuptial agreement. (Tr. 9-10). The wife testified she could not afford an attorney, did not want to go against the husband's plan, and knew he would not get married without a prenuptial agreement. (Tr. 10, 18, 54). Although other evidence showed she still owned her unoccupied home, she claimed her refusal would have left her without a place to live. (Tr. 16, 18).

{¶5} The wife said she met the husband at the bank to sign the agreement before a notary and a witness (after the attorney said they could not sign in front of him and removed his name from the final copy). (Tr. 9-11, 30-31, 50). The wife testified she understood the agreement but also said she believed the husband would eventually void the agreement and they would collect future assets jointly. (Tr. 32-33, 43, 52).

{¶6} The husband testified he would not have gotten married without a prenuptial agreement, noting he worked for 39 years, had two sons, and wanted to protect his assets. He pointed out the wife still could have lived with him indefinitely in the absence of an agreement, testifying he never indicated she would have to move out if they did not get married. (Tr. 16, 81). The husband said he did not refuse to allow the wife to get an attorney, noting the drafting attorney told them both to get new attorneys to review the agreement before signing. (Tr. 70, 83). He said the wife accompanied him to two meetings with the attorney. (Tr. 67-68, 73). One meeting occurred around April 9, 2001. (Tr. 68). This was the computer-generated save date on the draft of the agreement originally containing the attorney's name. (Pl.Ex. 2).

{¶7} The final draft (signed on May 10, 2001) had a computer-generated save date of May 3, 2001. (Pl.Ex. 1). On this same date, the attorney drafted a letter to the

husband stating the agreement was enclosed and indicating a copy had been sent to the wife as well. The letter advised, "each of you should consult with separate independent counsel with regards to the agreement." (Pl.Ex. 3).

**{¶8}** The marriage license showed the parties' prior marriages, the application date of June 20, 2001, and the mayor as the person solemnizing the marriage on June 28, 2001. (Def.Ex. B). The husband testified there were no family members or other guests present at the ceremony in the mayor's office. (Tr. 72).

**{¶9}** In a July 12, 2022 judgment entry, the trial court overruled the wife's motion, finding the prenuptial agreement was valid under the test in *Gross v. Gross*, 11 Ohio St.3d 99, 464 N.E.2d 500 (1984). The court concluded the agreement was voluntarily entered, the wife failed to meet her burden to prove fraud, duress, coercion, or overreaching, and the asset list attached to the agreement provided full disclosure. The entry set the dates for the final settlement hearing and the divorce trial.

**{¶10}** At the final hearing, the parties confirmed they entered a settlement on the remaining issues. The resulting divorce decree provided: the parties would split the $261,000 remaining in escrow from the sale of the marital residence (noting the court previously released $50,000 from the sale to each party); each party would keep the vehicle they drove; and the husband would pay the wife $650 per month for 84 months with the court retaining jurisdiction. The decree also said each party would retain the accounts in their own names and the property in their possession.

**{¶11}** The court attached and incorporated the prior judgment enforcing the prenuptial agreement, noting it had merged into the final order and the wife was not relinquishing her right to appeal the order by settling the other issues. The wife filed a timely appeal from the December 6, 2022 divorce decree.

ASSIGNMENT OF ERROR

**{¶12}** The wife sets forth the following assignment of error:

"The trial court erred in holding the prenuptial agreement enforceable."

**{¶13}** The parties agree the validity of the antenuptial agreement presented a question of fact for the trial court, which will not be reversed absent an abuse of discretion. *In re Estate of Gates v. Gates*, 7th Dist. Columbiana No. 06 CO 60, 2007-Ohio-5040, ¶

13, citing *Bisker v. Bisker*, 69 Ohio St.3d 608, 609-610, 635 N.E.2d 308 (1994). An abuse of discretion exists if the decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 218, 450 N.E.2d 1140 (1983).

{¶14} "Antenuptial agreements containing provisions for disposition of property and setting forth amounts to be paid as sustenance alimony upon a subsequent divorce of the parties are not contrary to public policy." *Gross*, 11 Ohio St.3d 99 at paragraph one of syllabus. As to the allocation of property, we view the circumstances as of the time of contract execution to discern if the agreement is enforceable; if the test is met, then a court cannot substitute its judgment for the parties and amend the contract. *Id.* at 109-110 (whereas a spousal support clause also allows the review of circumstances at the time of the divorce; the agreement at issue here provided for the future allocation of property without limiting the court's ability to order spousal support).

{¶15} Prenuptial agreements are valid: "(1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce." *Gross v. Gross*, 11 Ohio St.3d 99, 464 N.E.2d 500 (1984), paragraph two of the syllabus. These requirements were imposed because the parties are seen as occupying a fiduciary relationship toward each other. *Fletcher v. Fletcher*, 68 Ohio St.3d 464, 466, 628 N.E.2d 1343 (1994). The test encompasses "general tests of fairness" in fulfilling the duty of good faith. *Gross*, 11 Ohio St.3d at 108.

{¶16} Under the first element, overreaching is defined as the situation where "one party by artifice or cunning, or by significant disparity to understand the nature of the transaction, to outwit or cheat the other." *Id.* at 105. The burden of proving fraud, duress, coercion or overreaching is on the party challenging the agreement. *Fletcher*, 68 Ohio St.3d at 467.

{¶17} The second element is "satisfied either by the exhibiting of the attachment to the antenuptial agreement of a listing of the assets of the parties to the agreement, or alternatively a showing that there had been a full disclosure by other means." *Gross*, 11

Ohio St.3d at 108. The burden as to full disclosure rests on the one seeking to uphold the agreement. *Fletcher*, 68 Ohio St.3d at 467.

**{¶18}** On the third element, the Ohio Supreme Court pointed out "these types of agreements tend to promote or facilitate marriage, rather than encourage divorce." *Gross*, 11 Ohio St.3d at 105. On this topic, the Court provided a hypothetical example where an agreement provides a significant lump sum after the lapse of a very short marriage. *Id.* at 105, 100 (distinguishing the case before it where the parties "married and lived together as man and wife for fourteen years, which shows marriage must have been a harmonious one for a considerable period of time"). *Id.* at 110.

**{¶19}** Here, the wife focuses on the first element of the test. She contends she did not have a meaningful opportunity to consult with an attorney. She claims the agreement was presented not long before their wedding date, and she mentions hardship and emotional stress. She cites an appellate case invalidating a prenuptial agreement where the wife testified the husband said they would not get married if she did not sign the agreement presented to her by the husband's attorney. *See Rowland v. Rowland*, 74 Ohio App.3d 415, 599 N.E.2d 315 (4th Dist.1991).

**{¶20}** In *Fletcher*, the Supreme Court discussed the situation where the agreement is presented on the "eve of the wedding" and did not disallow the practice of presenting agreements "at the eleventh hour before the wedding ceremony." *Fletcher*, 68 Ohio St.3d at 469-470 (citing three examples of agreements presented on the wedding day and one case with a sample agreement viewed one week before the wedding and executed on the eve of the wedding). The meaningfulness of the opportunity to consult with counsel before execution of the prenuptial agreement is part of the coercion and overreaching analysis. *Fletcher*, 68 Ohio St.3d at 470. "Nevertheless, an agreement signed without counsel is not per se invalid, and mere regret at an unwise decision does not establish duress, coercion, fraud or overreaching." *Id.* Presenting the agreement "a very short time before the wedding ceremony will create a presumption of overreaching or coercion" but only if "the postponement of the wedding would cause significant hardship, embarrassment or emotional stress." *Id.*

{¶21} The *Fletcher* Court affirmed the enforcement of the agreement partly based on a finding that the postponement of the wedding would not have caused significant hardship, embarrassment, or emotional stress. *Id.* at 469-470. It was pointed out the trial court occupied the best position for making credibility determinations related to testimony on the prenuptial agreement. *Id.* at 468 (where the wife also claimed she was led to believe everything accumulated together would be divided).

{¶22} In the Fourth District's *Rowland* case cited by the wife, the writing appellate judge said the findings on duress and coercion were best left for the trier of fact but opined there was evidence of overreaching. *Id.* at 421. A second judge concurred in judgment only. The third judge dissented, pointing out the principal opinion appeared to erroneously place the burden of proving the validity of that agreement on the wrong party. *Id.* at 426 (Stephenson, J., dissenting) (and stating the court substituted its judgment for the credibility determinations of the trier of fact).

{¶23} As the husband points out, *Rowland* was decided prior to the Supreme Court's *Fletcher* case, which explained the challenger has the burden to prove fraud, duress, coercion, or overreaching. *Fletcher*, 68 Ohio St.3d at 467. Moreover, *Rowland* involved additional and highly distinguishable factual circumstances where the wife was only 18 years old, pregnant, suffering from morning sickness, lacking in experience, and not advised to seek her own counsel before she signed the agreement at the attorney's office days before the wedding. *Rowland*, 74 Ohio App.3d at 421-423.

{¶24} The husband cites this court's *Gates* decision upholding a trial court's decision to enforce a prenuptial agreement where: the parties lived together before marriage; Mrs. Gates testified Mr. Gates told her they would not get married if she did not sign the prenuptial agreement; and they had an informal wedding before a mayor with no family present and no reception after the wedding. *In re Estate of Gates v. Gates*, 7th Dist. Columbiana No. 06 CO 60, 2007-Ohio-5040, ¶ 2-9, 45. Unlike the situation in the case at bar, Mrs. Gates was not advised to seek her own attorney, and the prenuptial agreement was presented to her hours before the wedding. *Id.* at ¶ 46, 51. Despite the testimony about wanting to get married on a specific date coinciding with the wedding anniversary of the parents of Mr. Gates, we found a delay of the wedding to allow the wife

to consult an attorney would not have created a hardship. *Id.* It was noted the presentation of the agreement by Mr. Gates was not a surprise, as the parties discussed it in the prior month (after obtaining a marriage license) and Mrs. Gates knew about his concerns arising from his prior divorce. *Id.* at ¶ 46. We also observed she had the obligation to read the document before signing it and credibility determinations were for the trial court. *Id.* at ¶ 47-49.

**{¶25}** Here, the wife's testimony acknowledged they specifically discussed the subject of a prenuptial agreement two or three months before the signing (before the application for a marriage license). The agreement was not presented to the wife for the first time on the day of signing (even if one were to construe the wife's vague testimony in her favor). The husband testified the contents of the agreement were originally reviewed by the wife at the attorney's office. The agreement later arrived in the mail. Thereafter, the wife met the husband at a bank to have the signing witnessed and notarized.

**{¶26}** As the husband emphasizes, this case does not involve an "eve of the wedding" situation discussed in *Fletcher*. The parties signed the agreement *seven weeks* before they were married. Furthermore, the wedding ceremony took place in the local mayor's office (after applying for the marriage license the prior week). Notably, there were no guests at the wedding, not even family. There was no indication any postponement to consult with an attorney would have caused significant hardship, embarrassment, or emotional stress. There was plenty of time to consider the agreement further and consult with counsel. In fact, there was no indication the wedding was scheduled at the time they were reviewing the prenuptial agreement.

**{¶27}** Contrary to the wife's contention, the husband's ownership of more assets than her before marriage is not some weighty factor in her favor; this is a prompt behind most prenuptial agreements in the first place (and part of the reason for the special test for prenuptial agreements). A statement by a party about not remarrying in the absence of a prenuptial agreement is not uncommon and does not itself render the other party's signing involuntary. *See Gates*, 7th Dist. Columbiana No. 06 CO 60 at ¶ 6, 45. The wife knew the husband went through three divorces and had two adult children; he had a

prenuptial agreement with his third wife.  The cited seventeen-year age difference does not weigh in the wife's favor since she was 39 years old at the time she signed the agreement; in addition, she was previously married and divorced.

{¶28}  The wife claims she would have had no home if she did not sign because she moved into the husband's house with her teenage child.  However, she acknowledged she still owned her home at the time she signed the agreement.  The husband invited her to move in with him without being married and testified he would not have told her to move out merely because a wedding may not take place.

{¶29}  The attorney who drafted the agreement advised the wife to obtain her own attorney for consultation and said he was not representing her; he even refused to let them sign in his presence due to her failure to consult counsel.  The wife testified she lacked the means to pay an attorney to review the document and did not believe the husband would approve if she obtained another attorney.  We note the husband believed he paid $200 for the attorney's services in drafting the agreement.  We also note the meaningful opportunity to consult with counsel does not imply a right to have counsel paid for by the other party.  In addition to owning a house and car, the wife's asset disclosure shows she had $1,000 in the bank and $7,000 in an investment account.  She quit her job without obtaining another job before or in the months after moving.  She had a meaningful opportunity to consult with counsel and chose to sign without doing so.

{¶30}  Contrary to another suggestion by the wife, the attorney's May 3, 2001 letter about changes is not concerning merely because the parties' memories on the meetings were hazy more than 20 years later.  The changes between the April 9, 2001 and May 3, 2001 copies, which were both admitted as exhibits, were apparent on the face of the documents.  (Pl.Ex. 1-2).  The main change was made for the wife's protection; a parenthetical was added to the asset list to explain the Alliance house was solely the wife's asset and was only titled in the parties' joint names for convenience.  Other changes involved replacing the term antenuptial with the more familiar term prenuptial and removing the attorney's name from below a signature line.

{¶31}  In conclusion, the trial court occupied the best position to assign credibility to witness testimony and to weigh the evidence.  Upon conducting the above review, we

conclude the court did not abuse its discretion in finding the wife did not meet her burden of proving her allegation that the agreement was entered under duress, coercion, or overreaching. Accordingly, the wife's assignment of error is overruled.

{¶32} For the foregoing reasons, the trial court's decision is affirmed.

D'Apolito, P.J., concurs.

Hanni, J., concurs.

[Cite as *Maloney v. Maloney*, 2023-Ohio-4448.]

---

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, General Division of Carroll County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**