[Cite as *Carmen v. Carmen*, 2012-Ohio-3255.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**Nos. 97539 and 97542**

---

# SUSAN CARMEN

PLAINTIFF-APPELLANT/
CROSS-APPELLEE

vs.

# ERIC CARMEN

DEFENDANT-APPELLEE/
CROSS-APPELLANT

---

## JUDGMENT:
## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

---

Civil Appeal from the
Cuyahoga County Common Pleas Court
Domestic Relations Division
Case No. D-327485

**BEFORE:** Boyle, P.J., Cooney, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** July 19, 2012

**ATTORNEYS FOR APPELLANT/CROSS-APPELLEE**

James R. Skirbunt
Sharon A. Skirbunt
Skirbunt, Skirbunt & Wirtz
One Cleveland Center, Suite 3150
1375 East Ninth Street
Cleveland, Ohio    44114

**ATTORNEYS FOR APPELLEE/CROSS-APPELLANT
ERIC CARMEN AND CARMEN FAMILY GIFT TRUST**

Margaret E. Stanard
Stanard & Corsi Co., LPA
1370 Ontario Street
Suite 748
Cleveland, Ohio    44113

Steven A. Friedman
Damon R. Mace
Squire Sanders (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio    44114

John R. Climaco
Margaret M. Metzinger
Climaco, Wilcox, Peca, Tarantino & Garofoli
55 Public Square
Suite 1950
Cleveland, Ohio    44113

**Guardian ad litem**

Sunny M. Simon
Skylight Office Tower
1660 West 2nd Street
Suite 410

Cleveland, Ohio    44113

**For Merrill Lynch**

Stephen M. Bales
Ziegler Metzger LLP
925 Euclid Avenue
Suite 2020
Cleveland, Ohio 44115-1441

MARY J. BOYLE, P.J.:

{¶1} This appeal by Susan Carmen and cross-appeal by Eric Carmen claims errors by the trial court concerning the parties' antenuptial agreement as it relates to the trial court's division of property, the appropriate amount of spousal support, and the award of attorney fees.[1]

{¶2} Eric and Susan were married on May 22, 1993. They had two children born during their marriage — in 1997 and in 2000. Before they got married, they entered into an antenuptial agreement. Attached and made part of the antenuptial agreement was a statement of each party's assets. Susan disclosed assets of $27,000; Eric disclosed nearly $2 million in assets, including $1 million in intellectual property rights from songs that he had written or performed. During their marriage, Eric and Susan used the income from Eric's royalties to pay living expenses, which according to both were quite extravagant.

{¶3} In May 2008, Eric transferred his copyrighted songs and royalties from those songs into an irrevocable trust, naming his brother, Fred Carmen, as trustee. Under the trust, the trustee has discretion to distribute income generated by the trust assets for the benefit of Eric and his children during Eric's lifetime. Upon Eric's death, the trust assets devise to his children.

---

[1]See appendix for assigned errors.

{¶4} Susan admits that there is "no marital estate," and that "[a]ll of the assets of the parties are traceable to the royalties received by [Eric] from copyrights owned by him prior to the marriage." She further stipulated below that the parties' antenuptial agreement was "valid, binding and enforceable." She argues, however, that the trial court erred (1) when it improperly construed the antenuptial agreement, (2) by not finding that Eric breached his fiduciary duty to Susan and/or that Eric committed constructive fraud, (3) by not awarding her attorney fees, and (4) in its division of property.

{¶5} Eric argues that the trial court improperly awarded Susan non-marital property, contravening the parties' antenuptial agreement, and that the trial court erred in awarding Susan spousal support beyond the duration set forth in the antenuptial agreement and in calculating the spousal support for 2010.

{¶6} Having reviewed the record and relevant law, we affirm the trial court's judgment in part and reverse in part. The necessary facts will be set forth as needed.

Standard of Review

{¶7} To the extent that Eric and Susan challenge the trial court's interpretation of the antenuptial agreement, we review the trial court's decision de novo. *Todd v. Todd*, 10th Dist. No. 99AP-659, 2000 WL 552311, *5 (May 4, 2000). But to the extent they challenge any factual findings made by the trial court, we will not reverse a trial court's decision if there was some competent, credible evidence before it. *Winkler v. Winkler*, 5th Dist. No. 2004AP100065, 2005-Ohio-1473, ¶ 10.

Construing Language in the Antenuptial Agreement:
"Except as Otherwise Provided"

**{¶8}** In her first assignment of error, Susan argues that the trial court erred when it found that transfers of Eric's property into the irrevocable Carmen Family Gift Trust ("Trust") were "valid and authorized" by the antenuptial agreement. She maintains that in making such a finding, the trial court "grossly misconstrued or simply ignored" language in the agreement that stated, "except as otherwise provided." She claims that this language in the agreement, "except as otherwise provided," prohibited Eric from transferring his assets into the Trust.

**{¶9}** An antenuptial agreement is a contract entered into between a man and a woman in contemplation and consideration of their future marriage where the property rights and economic interests of either the prospective husband or wife, or both, are determined and set forth. *Rowland v. Rowland*, 74 Ohio App.3d 415, 419, 599 N.E.2d 315 (4th Dist.1991). These agreements may include provisions concerning the disposition or devolution of property and payments for sustenance upon the death of one or other of the spouses, or provisions for the distribution of property and the sustenance or maintenance of one or other of the spouses, upon a separation or divorce, or any combination of the concerns between the parties. *See Gross v. Gross*, 11 Ohio St.3d 99, 464 N.E.2d 500 (1984).

**{¶10}** Susan specifically points to three provisions in the antenuptial agreement that contain the language "except as otherwise provided." The three provisions highlighted by Susan are Article VI, "Property Owned by the Parties," Article VII,

"Divorce, Dissolution, Annulment or Legal Separation," and Article IX, "Division of Property."

{¶11} Article VI, "Property Owned by the Parties," states:

Each of the parties agrees that all property * * * belonging to the other party at the commencement of their marriage; all property acquired during the marriage by the other party out of the proceeds or income from property owned at the commencement of marriage, or attributable to appreciation in value of said property, * * * and all property acquired by the other party by gift or inheritance shall then remain the separate property of the other party.

{¶12} Article VI goes on to state that "[e]xcept as otherwise provided," each party "shall have the full and absolute right to control and dispose of any and all property now or hereafter owned" by him or her, "in the same manner as if said marriage had not been entered into, including * * * the right to dispose of the same in any manner by sale, gift, intervivos or testamentary disposition or otherwise[.]"

{¶13} Article VII states that "in the event of the termination of the marriage during the lifetime of the parties," each party agrees to waive his or her right to spousal support "except as otherwise provided" in Article VIII (Article VIII sets forth the spousal support provisions, which we will address in Eric's cross-appeal). Article VII further provides, inter alia, that each party would retain his or her own property "except as otherwise provided in Article IX."

{¶14} Article IX provides that each party would receive 50 percent of the marital property (which Susan admits is zero in this case). Article IX goes on to state that regardless of the amount of marital property, "on or after the fifteenth anniversary of the marriage between [Eric] and [Susan], [Susan] shall be entitled to receive not less than

15% of the value of the pre-marital and non-marital assets owned by [Eric] as of the date of the termination of the marriage." Thus, under the antenuptial agreement, Susan was to receive 50 percent of the marital property or 15 percent of Eric's premarital and nonmarital assets.

{¶15} After reviewing the agreement, we find no error on the part of the trial court with respect to construing the language in the antenuptial agreement. The language, "except as otherwise provided," simply referred to other provisions in the agreement that expanded upon or more specifically described what would happen in the event the parties divorced.

{¶16} Although Susan claims that the agreement did not permit Eric "to simply divest himself of his separate property," it actually did just that. The agreement specifically states that each party "shall have full and absolute right to control and dispose of any and all property now or hereafter owned" by him or her, "in the same manner as if said marriage had not been entered into, including * * * the right to dispose of the same in any manner by sale, gift, intervivos or testamentary disposition or otherwise * * *."

{¶17} Susan's first assignment of error is overruled.

## Constructive Fraud

{¶18} In her second assignment of error, Susan contends that the trial court erred (1) when it found that Eric did not breach his fiduciary duty to Susan; (2) when it found that Eric did not commit constructive fraud; and (3) when it did not impose a constructive

trust for her benefit "consistent with her interest in the separate property of [Eric]." These three issues are interrelated and will be discussed together.

{¶19} The elements of this claim are very similar to the elements of a breach of fiduciary duty claim. Constructive fraud is defined as "a breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *Cohen v. Estate of Cohen*, 23 Ohio St.3d 90, 91-92, 491 N.E.2d 698 (1986). "'Constructive fraud does not require proof of fraudulent intent; the law indulges in an assumption of fraud for the protection of valuable social interests based upon an enforced concept of confidence both public and private.'" *Cohen* at 92, quoting *Perlberg v. Perlberg*, 18 Ohio St.2d 55, 58, 247 N.E.2d 306 (1969).

{¶20} Constructive fraud is different from actual fraud. Actual fraud requires an "affirmative misrepresentation," while constructive fraud results from the "failure to disclose facts of a material nature where there exists a duty to speak." *Layman v. Binns*, 35 Ohio St.3d 176, 178, 519 N.E.2d 642 (1988). Further, constructive fraud typically exists where the parties to an agreement have a special confidential or fiduciary relationship. *Cohen* at 92.

{¶21} A fiduciary duty is generally defined as "'[a] duty of utmost good faith, trust, confidence, and candor owed by a fiduciary * * * to the beneficiary * * *; a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person.'" *In re Trust of Bernard*, 9th Dist. No. 24025,

2008-Ohio-4338, ¶ 20, quoting from *Black's Law Dictionary* 545 (8th Ed.Rev.2004). A "fiduciary" is defined as "a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." *Strock v. Pressnell*, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988).

{¶22} The parties to an antenuptial agreement are in a fiduciary relationship to one another and, thus, are under a mandatory duty to act in good faith with a high degree of fairness and disclosure of all circumstances that materially bear on the antenuptial agreement. *Gross*, 11 Ohio St.3d at 108, 464 N.E.2d 500; *Cohen*, 23 Ohio St.3d at 92, 491 N.E.2d 698.

A. Seminal Ohio Case: *Cohen v. Estate of Cohen*

{¶23} Susan argues that this case is analogous to *Cohen*. In *Cohen*, Esther Tort and Jack Cohen entered into an antenuptial agreement providing that upon Jack's death, Esther would receive $700 per month for her maintenance for life. A week later, but before Esther and Jack were married, Jack executed a deed that transferred a life estate in the majority of his assets that he had disclosed in the antenuptial agreement to his daughter with a remainder interest to her children.

{¶24} Jack died six months after he and Esther were married. His estate was not able to fully perform its obligation to pay Esther $700 per month due to Jack's transferring his assets out of his estate. Esther brought an action against Jack's estate, his daughter, and her children.

**{¶25}** The Ohio Supreme Court, holding that the doctrine of constructive fraud is applicable to antenuptial agreements, found that Jack's transfer of his assets defeated the intent of the antenuptial agreement. *Id.* at 92. The court explained that the act was "contrary to [Jack's] legal duty under the contract and to the fiduciary relationship which existed between decedent and the appellant by virtue of their anticipated marital status." *Id.*

**{¶26}** The Supreme Court determined that constructive fraud existed even though there were no facts in the record to lead it "to believe that [Jack] had any intent to defraud [Esther] when the conveyances to his daughter were made." *Id.* It explained that Jack "need not have intended to defraud appellant for constructive fraud to be found," because fraudulent intent was not required. *Id.* Significant to the court's analysis was the fact that Jack and Esther had a "special confidential or fiduciary relationship"; they "were not only parties to a contract, but were also engaged." *Id.*

B. Facts in this Case and Trial Court's Findings

**{¶27}** The facts set forth at trial established that Eric first approached Attorney Steven Gariepy, a certified specialist in estate planning, in 2004 to discuss various estate planning options. Eric explained that his father was diagnosed with Parkinson's in 2000. Sometime in 2004, Eric and his brother, Fred Carmen, visited their father in the hospital and realized he had dementia. After his father died in March 2007, Eric said it "gave [him] a real sense of [his] own mortality," and that is when he told Fred that they needed to see Gariepy to "put something together in earnest." Eric explained that he

wanted to create a trust to protect his songs and "make sure they [went] to his children." He also stated that he wanted "someone to keep an [eye] on the amount of spending that [he] was doing, because [he] was a little disturbed that [he] was making a pretty good amount of money, and there wasn't anything left at the end of year, and [he] thought that Fred would be a good person to do that."

{¶28} In 2007, Gariepy drafted an irrevocable trust, the Carmen Family Gift Trust, for Eric. Fred Carmen was named the trustee. On July 30, 2007, the trust was executed by Eric. After Eric signed the trust, Gariepy began the process of transferring assets into it.

{¶29} Gariepy testified that transferring Eric's intellectual property into the trust was a complex process. He explained that Eric owned many of his songs outright, but also owned many of them in conjunction with others and owned many of them as part of a company. Gariepy further explained that even after a comprehensive list of Eric's songs was created, it still took a lot of time to search for and find the various entities owning the songs in conjunction with Eric, and some of the entities no longer existed. Gariepy testified that Eric never told him that he intended to divorce his wife or hide assets from her. Gariepy said that no one pressured him to get the trust funded by a certain date. The transfer of Eric's copyrights and royalties from those copyrights was complete in May 2008, just before Susan and Eric's 15th wedding anniversary.

{¶30} After May 2008, Fred Carmen, as trustee, paid for all of Susan's and Eric's living expenses, in excess of $19,000 per month, out of the trust funds.

**{¶31}** Susan testified that she did not learn of the creation of the trust until after she filed for divorce. She stated that her reaction was "disbelief," and that she "didn't know anything about it." She further said that she was "surprised" and it "was shocking to [her]" that Eric had this document drawn up without her knowledge. She testified that "when [she] looked at the terms in [the] prenup, [she] assumed that [she] would be taken care of."

**{¶32}** The trial court found in Eric's favor, explaining:

> The court finds the [trust] was established in July 2007 after defendant's father passed away and finds his testimony credible on this issue. Over the course of nine months, the attorney assigned to create the trust, Steven Gariepy, and eight other attorneys, spent their time trying to locate all of husband's songs. Some of which were owned individually by husband, some were owned by various legal entities, some in shared ownership with both individuals and legal entities and others were registered as part of a collection. The court further finds once all of husband's songs were duly located, reorganization and restructuring of the various legal entitles had to occur in order to properly place all the copyrights into the [trust]. It was the extraordinary amount of work that caused the trust to be fully funded and operational on May 12, 2008. The creation of the trust occurred over two years prior to wife's seeking to terminate the marriage and no evidence was presented that husband was contemplating ending the marriage. The evidence and testimony demonstrated that even after husband created and funded the [trust], he paid for wife to advance her education at Ursuline College, purchased an expensive vehicle, paid for numerous cosmetic procedures in line with the "endless supply" of money that flowed through the home.

**{¶33}** The trial court found that Susan "failed to rebut the testimony of Husband that the [trust] was established to create third-party management of the assets and to preserve and protect the copyrights for the parties' children." The trial court also found that Eric had "sold or disposed of the assets he owned prior to marriage, with full

knowledge of [Susan] and no objection from [Susan]." The court further found that "[b]oth parties testified their memories were faulty as to whether or not a discussion was held regarding the [trust]."

C.    Analysis

**{¶34}** After reviewing the record and pertinent law, we affirm the trial court's finding that Eric did not breach his fiduciary duty to Susan and that there is no constructive fraud. Susan is correct that a finding of fraudulent intent is not required. But we disagree that Eric's transfer of his copyrighted material into the trust defeated her rights under the antenuptial agreement.

**{¶35}** Under the antenuptial agreement at issue, Susan and Eric agreed that each had "the full and absolute right to control and dispose of any and all property now or hereafter owned by [her or him] * * * including, without limiting the generality of the foregoing, the right to dispose of the same in any manner by sale, gift, intervivos or testamentary disposition or otherwise[.]" We find it significant that Eric did not transfer all of his separate property into the trust. Eric only transferred the rights to his copyrighted property — over 200 songs he either created or performed — and the royalties from that property, into the trust. Indeed, Eric did not transfer a considerable amount of his separate property to the trust, property amounting to over $1.6 million (see

our discussion later in this opinion). Susan is entitled to 15 percent of that separate property under the antenuptial agreement (as we discuss in a later section).

{¶36} We find *Cohen* to be distinguishable, although not for the reasons argued by Eric. Eric argues that *Cohen* is distinguishable because the husband transferred his assets just days after he and his fiancee signed the antenuptial agreement, but before they were married. We disagree that is the distinguishing factor. In *Cohen*, the Supreme Court did not find the timing of the transfer to be suspect. Rather, in *Cohen*, the husband's transfer of his assets completely frustrated the antenuptial agreement because his remaining estate could not pay the wife $700 per month as promised in the antenuptial agreement. *Id.* at 92.

{¶37} Unlike *Cohen*, Susan's rights under the antenuptial agreement were not completely frustrated. She was still entitled to a significant amount of Eric's separate property. Further, Eric was still able to pay Susan spousal support as dictated by the antenuptial agreement (35 percent of Eric's income from the previous year, which in 2008 was $634,517 or $18,506.75 per month), and pay child support for his two children ($2,500 per month for both children).

{¶38} Accordingly, we conclude that there was competent, credible evidence before the trial court to support its finding that Eric did not commit constructive fraud; the evidence established that the creation of the trust and the transfer of assets into it did not completely frustrate Susan's rights under the antenuptial agreement.

{¶39} Susan's second assignment of error is overruled.

Attorney Fees

**{¶40}** In her third assignment of error, Susan argues that the trial court abused its discretion when it refused to allow her to present evidence regarding attorney fees and by not awarding her attorney fees.

**{¶41}** In an action for divorce, a court may award all or part of reasonable attorney fees and litigation expenses to either party if the court finds the award equitable. R.C. 3105.73(A). In determining whether such an award is equitable, "the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate." R.C. 3105.73(A). An award of attorney fees under R.C. 3105.73 lies within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Huffer v. Huffer*, 10th Dist. No. 09AP-574, 2010-Ohio-1223, ¶ 19.

**{¶42}** Here, Susan stipulated to the validity of the antenuptial agreement. The antenuptial agreement specifically provided that "neither party shall be entitled to * * * any expense money or counsel fees in connection with any divorce, dissolution, annulment or legal separation, and each party agrees to waive any and all such claims."

**{¶43}** Susan testified that she was represented by competent counsel when she entered into the antenuptial agreement and that she negotiated its terms. She stated that

when negotiating, she knew what she wanted from the marriage. Susan could have negotiated for Eric to pay her attorney fees upon divorce, but she did not do so. Accordingly, we find no abuse of discretion on the part of the trial court.

{¶44} Susan's third assignment of error is overruled.

<u>Susan's Fourth Assignment of Error and
Eric's First Cross-Assignment of Error: Property Division</u>

{¶45} Susan's fourth assignment of error states that the trial court erred when it relied "on facts that were wholly unsubstantiated by the record," and by "lifting sections of [Eric's] proposed judgment entry and including them, virtually verbatim, in its judgment entry of divorce without first verifying those sections for accuracy." But in reviewing the seven pages of Susan's brief on this assignment of error, this court cannot decipher what it is that she is arguing. Much of what she argues under this assignment she already argued in her first two assignments of error, and we find it to be duplicative.

{¶46} But Susan's first sentence under this assignment of error is that "[t]he decision of a trial court concerning the division of property is reviewed for abuse of discretion." Accordingly, we presume that it is the trial court's division of property that Susan is ultimately challenging in her fourth assignment of error, which she argues in the last two pages.

{¶47} We will also address these arguments regarding the division of property with Eric's first cross-assignment of error, as he also maintains that the trial court erred when it divided the property.

A.    <u>Arguments Regarding the Property Division</u>

### 1. Susan's Arguments

**{¶48}** Susan maintains that the trial court erred when it "accounted for the second mortgage" on three different occasions: (1) when it credited Eric with temporary support payments of $52,014.88 for the nonpayment of the second mortgage, (2) when it determined the net proceeds from the sale of the residence, and (3) when it subtracted the same second mortgage in its calculation of the value Susan would receive for the household furnishings.

**{¶49}** Susan further argues that the trial court erred when it stated on the record that it would "take into consideration the $105,620 overpayment of federal income tax from [Eric's] 2009 Federal Income Tax Return and determine whether it was or was not marital property," but then never did.

### 2. Eric's Arguments

**{¶50}** In his first cross-assignment of error, Eric argues that the trial court erred when it awarded Susan 50 percent of the value of his separate and non-marital property, where the antenuptial agreement provided for Susan to receive only 15 percent of the value of it. He further argues that the trial court erred when it awarded Susan possession of his separate property, when the antenuptial agreement provided that she receive only the value of such item, and not the property itself. Finally, he argues that the trial court erred when it required him to sell his home, as opposed to awarding Susan 15 percent of the value of the home.

**{¶51}** Susan responds that under R.C. 3105.171, the trial court was authorized to make a distributive award to her of Eric's separate property. But we find that the antenuptial agreement here specifically addresses how to handle separate property and supplants that statute. *See Radcliffe v. Radcliffe*, 2d Dist. No. 14130, 1994 WL 151679 (Apr. 27, 1994) (where antenuptial agreement specifically addresses how to distribute separate property, R.C. 3105.171 is not applicable).

B.     Trial Court's Findings and Orders

**{¶52}** The trial court found Eric's separate property to be: (1) the marital residence, (2) the furniture and furnishings, (3) three vehicles, and (4) two Schwab accounts.

1.     Marital Residence

**{¶53}** Susan's expert valued the marital residence at $1.3 million. Eric's expert valued it between $755,000 and $770,000. There was a first mortgage on the property of $800,000 and a second mortgage (open end mortgage) of $300,000.

**{¶54}** The trial court valued the home at $950,000, but found that "even at the value of $950,000, the mortgages on the property exceed the value of the home." The trial court ordered that the home be listed for sale within 30 days of the journalization of the court's order, and ordered the parties to equally divide any profit or deficiency.

2.     Furnishings and Three Vehicles

**{¶55}** The parties stipulated that the furnishings were valued at $203,878 and that the three vehicles were valued at $119,525 ($34,100 for a 2008 Range Rover titled in

Susan's name, $39,625 for a 2008 Range Rover titled in Eric's name, and $45,800 for a 2007 Jaguar titled in Eric's name).

{¶56} The trial court found that "there is a corresponding debt associated with the aforementioned items, the second mortgage through J.P. Morgan Chase, with an approximate balance of $311,993.00." The court therefore found that the net value of the furnishings and vehicles was $11,410.

{¶57} It ordered that Susan "shall receive $5,705 as a distributive award of marital property for the value of the furniture and furnishings."

{¶58} It further ordered that Susan receive the 2008 Range Rover titled in her name, and that Eric receive the 2008 Range Rover titled in his name and the 2007 Jaguar titled in his name.

### 3. Two Schwab Accounts

{¶59} The trial court found that Eric had two Schwab accounts worth $389,995. It ordered that Susan be awarded $194,997 from these accounts pursuant to Article IX of the antenuptial agreement. It then stated, "[i]t is hereby ordered that [Eric] shall pay [Susan] the aforementioned amount as a distributive award of marital property[.]"

{¶60} The court stated that it determined that "foregoing constitutes a substantially equal division of the marital property."

### C. Analysis

**{¶61}** First, we note that in dividing the property (the house, furnishings, cars, and Schwab accounts), the trial court properly found that it was all Eric's separate property, but then incorrectly proceeded to treat the property as marital. By treating it as marital property, the court awarded Susan 50 percent of it. The trial court erred by doing so. It was undisputed that in this divorce, there was no marital property. The court was dividing all nonmarital property, subject to Susan's 15 percent division as provided in the antenuptial agreement — not 50 percent. But we do agree with Susan that the trial court applied the second mortgage more than once (to the value of the home and to the value of the furnishings and vehicles). Nonetheless, as set forth below, we affirm the trial court's judgment in part and reverse it in part.

1.   Marital Residence

**{¶62}** Eric argues that the trial court erred by ordering him to sell his home. We agree. The court valued the property at $950,000 (which neither party appealed), but then found that it had a mortgage and second mortgage amounting to $1,111,993. There is debt on the home amounting to more than it is worth, at least according to the trial court's finding that the home is valued at $950,000. It is undisputed that the home is Eric's separate property. Under the antenuptial agreement, Susan would receive 15 percent of the value of Eric's nonmarital property, not the property itself. Thus, we agree with Eric that he should be entitled to keep the home, and Susan should receive 15 percent of the value of the home, or $142,500. But we agree with Susan that she should

not be responsible to pay for any debt owed on the home. Eric should be responsible for any debt owed on it. Accordingly, the trial court should have awarded the home to Eric outright and should have ordered that he be solely responsible for the first and second mortgage (from the date of the final divorce decree).[2]

### 2. Furnishings and Three Vehicles

**{¶63}** The parties stipulated that the furnishings were worth $203,878, and the vehicles were worth $119,525. Susan should receive 15 percent of the value of these items, or $30,581.70 for the furnishings and $17,928.75 for the vehicles. With respect to the Range Rover that the trial court awarded to Susan, however, we affirm that part of the trial court's property division. Even though the Range Rover was Eric's separate property, it was titled in Susan's name. And although under the antenuptial agreement, the trial court should have awarded Susan 15 percent of the *value* of the property, rather than the asset itself, we find this to be harmless error (compared to the house, which was worth significantly more than the vehicle). By allowing Susan to keep the Range Rover, however, she should receive $16,171.25 less from the total amount of her property division (because the Range Rover was worth $34,100, and she was only entitled to receive $17,928.75 for her portion of the value of the vehicles ($34,100 - $17,928.75 =16,171.25).

### 3. Schwab Accounts

---

[2]Although the trial court was well within its discretion to order that Susan pay the mortgage and second mortgage out of her temporary support for the period of time when she lived in the home without Eric during the pendency of the divorce.

**{¶64}** The Schwab accounts were valued at $398,995. Susan should have been awarded 15 percent of the value of these accounts, or $58,499.25, not half as the trial court ordered.

D.    Property Division Summary

**{¶65}** The total nonmarital property (home, furnishings, cars, and Schwab accounts) amounted to $1,663,398. Thus, under the antenuptial agreement, Susan should have received 15 percent of that amount, or $249,509.70. But taking into account her keeping the Range Rover, she should receive $16,171.25 less (because the Range Rover was worth more than she was entitled to for all three vehicles). Thus, Susan is entitled to $233,338.45.

**{¶66}** Although the trial court did not divide the property correctly (incorrectly treating it as marital and applying the second mortgage twice), it awarded Susan $234,802. Thus, the trial court awarded Susan $1,463.55 more than she was entitled to. We find this to be harmless error, considering it is less than one percent of the value of the nonmarital property.

**{¶67}** Susan also argues that the trial court failed to account for Eric's 2009 overpayment of taxes in the amount of $105,620. The trial court indicated at trial that it would determine if the $105,620 overpayment should be considered Eric's separate property that would be subject to division. But the trial court then failed to mention the overpayment in its final decree. We agree with Susan that the trial court should determine if she is entitled to 15 percent of the overpayment. If she is entitled to 15

percent of the $105,620 ($15,843), then the trial court should subtract $1,463.55 from that amount (because Susan received $1,463.55 more than she was entitled to as set forth in the previous paragraph). But if the overpayment resulted from Eric's royalties, then Susan would not be entitled to any of it. Thus, we reverse in part and remand for the trial court to consider Eric's 2009 overpayment of taxes and to revise the division of property as set forth above, allowing Eric to keep the home.

{¶68} Accordingly, the trial court's division of property is affirmed in part, and reversed in part.

## Spousal Support

{¶69} Eric's second and third cross-assignments of error challenge the trial court's award of spousal support. In his second cross-assignment of error, Eric maintains that the trial court erred when it awarded Susan 84 months of spousal support, rather than 66 months as set forth in the antenuptial agreement.

{¶70} Article VIII of the antenuptial agreement provided:

So long as [Susan] does not die, remarry, or cohabit with another, [Eric] shall pay [Susan] one month of spousal support for every three months elapsing between the date of the marriage and the date upon which either party commences marriage termination proceedings by filing a complaint for divorce[.]    * * * [Eric] shall pay [Susan], for such spousal support, an amount equivalent to 35% of his net annual earnings from employment and from royalties, based upon the previous calendar year. Such amount shall be subject to modification in accordance with increases or decreases in [Eric's] net annual earnings from employment and from royalties, in subsequent years.

{¶71} In Article X, the parties agreed that "there shall be no support pendente lite."

**{¶72}** The trial court found that despite the antenuptial agreement, it could award temporary support to Susan — which it did — in the amount of $18,506.75 per month. As for spousal support in the final decree, the trial court ordered Eric to pay Susan $18,506.75 per month beginning February 9, 2011 (the date the trial began), and continue for 66 months.

**{¶73}** Eric concedes that under Ohio law, the trial court had discretion to award temporary support to Susan during the pendency of the divorce. But he argues that the trial court should have begun the 66-month time from the date he started paying spousal support, not the date the trial began. Eric contends that by doing so, the trial court awarded Susan 18 more months of support than the antenuptial agreement provided, and that he should have been given credit for the 18 months "of so-called 'temporary' spousal support."

**{¶74}** Under R.C. 3105.18(B), "[d]uring the pendency of any divorce, or legal separation proceeding, the court may award reasonable temporary spousal support to either party." Further, "[a] trial court may award temporary support during the pendency of a divorce action pursuant to R.C. 3105.18 despite the existence of an antenuptial agreement to the contrary." *Cangemi v. Cangemi*, 8th Dist. No. 86670, 2006-Ohio-2879, ¶ 14, citing *Mulvey v. Mulvey*, 9th Dist. No. 17707, 1996 WL 724759 (Dec. 4, 1996).

**{¶75}** As permitted under Ohio law, the trial court ordered temporary support to Susan during the pendency of the divorce. In the final divorce decree, it ordered Eric to

pay Susan spousal support for 66 months as provided in the antenuptial agreement, beginning the date the divorce trial began. After a review of the record and pertinent law, we find no abuse of discretion on the part of the trial court in awarding spousal support for 66 months.

{¶76} Eric's second cross-assignment of error is overruled.

{¶77} In his third assignment of error, Eric argues that the trial court abused its discretion by not adjusting Susan's spousal support for the calendar year 2010, due to his 2009 income being less than his 2008 income. The provision at issue in the antenuptial agreement provides in pertinent part:

> [Eric] shall pay [Susan], for such spousal support, an amount equivalent to 35% of his net annual earnings from employment and from royalties, based upon the previous calendar year. Such amount shall be subject to modification in accordance with increases or decreases in [Eric's] net annual earnings from employment and from royalties, in subsequent years.

{¶78} Eric states that the trial court correctly calculated the spousal support for the year 2009, by using his 2008 income of $634,517 (35 percent of that is $222,081, resulting in monthly payments of $18,506.75). But he maintains that the spousal support for 2010 should have been based on his 2009 income, which was $495,691 (35 percent of that amount, $173,492, would equal monthly payments of $14,458). Thus, he claims he is entitled to a credit of $48,589 ($222,081 - $173,492).

{¶79} We disagree. In 2009 and 2010, Eric was paying Susan temporary support. The antenuptial agreement did not govern temporary support. Accordingly, Eric's third cross-assignment of error is overruled.

**{¶80}** Judgment affirmed in part, reversed in part, and remanded. Upon remand, the trial court is instructed to consider whether Susan should receive 15 percent of Eric's 2009 overpayment of taxes (and if so, subtract the $1,463.55 from it). Further, the court is to revise its division of property to award the home to Eric, subject to him being responsible for any debt owed.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

COLLEEN CONWAY COONEY, J., and
MARY EILEEN KILBANE, J., CONCUR

APPENDIX

**Assigned Errors on Appeal:**

[1.] The trial court erred as a matter of law and abused its discretion to the prejudice of Appellant in its construction of the language of the parties' Antenuptial Agreement by the court's finding that the transfers of appellee's property into the irrevocable Carmen Family Gift Trust were "valid and authorized" by the Antenuptial Agreement, and by the court's failing to construe the language in the parties' Antenuptial Agreement stating, "except as otherwise provided * * *"as a prohibition of, or at least a

limitation on, the authority of appellee to make such transfers during the parties' marriage and thereby defeat Appellant's rights and interests in and to said property under the terms of the Antenuptial Agreement.

[2.] The trial court erred as a matter of law and abused its discretion to the prejudice of Appellant in determining the Appellee did not breach his fiduciary duty to Appellant; by not finding the transfers of copyrights to the Trust to be constructive fraud; and, by not imposing a constructive trust upon The Carmen Family Gift Trust for the benefit of Appellant consistent with her interest in separate property of Appellee as set forth in the Antenuptial Agreement of the parties.

[3.] The trial court erred as a matter of law and abused its discretion to the prejudice of Appellant by prohibiting Appellant from putting into the record evidence of the attorney fees and litigation expenses she incurred in the divorce proceedings, and by not awarding Appellant a reasonable amount of attorney fees and expenses.

[4.] The trial court erred as a matter of law and abused its discretion to the prejudice of Appellant by relying on facts that were wholly unsubstantiated by the record, and, by lifting sections of Appellee's proposed judgment entry and including them, virtually verbatim, in its Judgment Entry of Divorce without first verifying those sections for accuracy.

**Assigned Errors on Cross-Appeal:**

[1.] With regard to the division of property, the trial court erred as a matter of law by (1) awarding plaintiff 50% of the value of Defendant Eric Carmen's separate and pre-marital property owned at the time of the termination of the marriage where the Antenuptial Agreement expressly provided for the award of only 15% of the value of Eric Carmen's separate and pre-marital property; (2) awarding Plaintiff possession of an item of Eric Carmen's separate and pre-marital property even though the Antenuptial Agreement only gave Plaintiff a right to the value of the property, and no right to the property itself; and (3) requiring Eric Carmen to sell his separate and pre-marital real property, as opposed to awarding Plaintiff 15% of the value of real property.

[2.] The trial court erred as a matter of law in awarding Plaintiff 84 months of spousal support where the plain and unambiguous terms of the

Antenuptial Agreement provided her with 66 months of spousal support at an agreed rate.

[3.] The trial court erred as a matter of law in disregarding the clear language in Article VIII of the Antenuptial Agreement that the amount of spousal support is subject to modification "based upon the previous calendar year."