[Cite as *Caley v. Glenmoor Country Club, Inc.*, 2013-Ohio-4877.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| | JUDGES: |
| RONALD P. CALEY, et al. | Hon. Sheila G. Farmer, P. J. |
| | Hon. John W. Wise, J. |
| Appellees/Cross-Appellants | Hon. Craig R. Baldwin, J. |
| -vs- | Case Nos. 2013 CA 00012 |
| | 2013 CA 00018 |
| GLENMOOR COUNTRY CLUB, INC. | |
| Appellant/Cross-Appellee | O P I N I O N |

CHARACTER OF PROCEEDING: Civil Appeal from the Court of Common Pleas, Case No. 2012 CV 00138

JUDGMENT: Affirmed in Part; Reversed in Part and Remanded

DATE OF JUDGMENT ENTRY: November 4, 2013

APPEARANCES:

For Appellees/Cross-Appellants

JOHN H. SCHAEFFER
PATRICK E. NOSER
CRITCHFIELD, CRITCHFIELD
& JOHNSON
225 North Market Street, P. O. Box 599
Wooster, Ohio 44691

For Appellant/Cross-Appellee

MARK S. FUSCO
KRISTIN R. ERENBERG
WALTER HAVERFIELD
1301 East Ninth Street
Suite 3500
Cleveland, Ohio 44114

*Wise, J.*

**{¶1}**   Defendant-Appellant, Glenmoor Country Club, Inc., appeals from the December 17, 2012, Judgment Entry of the Stark County Court of Common Pleas. Plaintiffs-Appellees, Ronald P. Caley, Susan Caley, Mark Gehring and Trudy Gehring have filed a cross-appeal.

<u>STATEMENT OF THE FACTS AND CASE</u>

**{¶2}**   This case involves four Appellees/Cross-Appellants: Mark and Trudy Gehring (the "Gehrings") and Ron and Susan Caley (the "Caleys") (collectively, "Appellees"), and Appellant/Cross-Appellee Glenmoor Country Club, Inc. ("Appellant" or "Glenmoor"). This case arises from a dispute over the return of Appellees' membership contributions from Glenmoor following their resignations from the Club.

**{¶3}**   Glenmoor is a for-profit corporation located in Canton, Ohio. Glenmoor is a country club with golf, spa, dining, banquet and business meeting facilities as well as overnight accommodations.

**{¶4}**   In 1990, the right of individuals to acquire equity memberships in Glenmoor was established by Bert and Iris Wolstein, through an entity known as Glenmoor Properties Limited Partnership. Such equity memberships in Glenmoor are sold pursuant to the Club's Membership Plan. (T. at 249-50, 280).

**{¶5}**   Equity golf members and non-equity golf members have exactly the same rights with respect to use of Glenmoor's club and golf facilities. *Id.* Equity members pay a higher initiation fee upon joining the Club than non-equity members do. (T. at p. 3, 6). At the time of trial, equity golf membership initiation fees were $30,000 and non-equity golf membership initiation fees were $15,000. *Id.* Equity memberships allowed for the

return of either 80% of the current value of the equity initiation fee or 100% of the member's initial investment. *Id.* Non-equity members do not receive any refund of their initiation payment. *Id.*

{¶6}　In 1997, Ron and Susan Caley became equity golf members at Glenmoor.

{¶7}　In 2004, Mark and Trudy Gehring became equity golf members at Glenmoor.

{¶8}　In late 2011, Appellees each resigned their equity memberships and demanded the return of their $30,000 equity initiation fee. Mr. Caley sent a written resignation to Glenmoor on September 30, 2011. Glenmoor recognized this resignation and placed him on the resignation repayment list. Mr. Gehring personally met with Mr. Vernis on two separate occasions in September, 2011, in order to discuss his resignation. Mr. Vernis testified that by the end of the second meeting, Mr. Gehring let him know that "he definitely was leaving the club." (T. at. 255). Mr. Gehring followed up with a written resignation dated October 3, 2011. Glenmoor denies receiving a copy of this written resignation. (*Id.*).

{¶9}　To date, Appellees' equity initiation fees have not been refunded and they have not been permitted to use the Glenmoor member facilities since the resignation of their Club memberships in September, 2011.

{¶10} On January 12, 2012, Appellees filed suit seeking the return of each of their $30,000 membership contributions, totaling $60,000. Glenmoor counterclaimed for an action on account against the Gehrings for the outstanding amount due their Club account at the time of resignation, $11,028.99.

**{¶11}** A bench trial convened in the Stark County Court of Common Pleas on November 13 and 14, 2012. During the course of the trial, the court heard testimony from Michael Ricker, Gretchen Fernandez, Myron Vernis, Ronald Caley, Mark Gehring, Joseph Ostrowske and Aaron Schaeffer.

**{¶12}** Michael Ricker testified that he has been a member of the Glenmoor Country Club since 1990, and that during that time he has served on different committees, the board of governors, and as past club president. (T. at 38-39). He testified that he is familiar with many of the documents related to the Club and club membership. (T. at 41-42). More specifically, he stated that he is familiar with and understands the rules and regulations contained in the Club's Code of Regulations and Membership Plan as set forth in 1990 when he joined and as revised in 1992. (T. at 42).

**{¶13}** On or about February 20, 1990, Glenmoor issued a Membership Plan, which included a Code of Regulations. The original Code of Regulations contained within the Membership Plan set forth the process for handling equity member resignations from the Club. (Article X, Section 8, p. C-15). The original Code of Regulations at Article X, Section 8(d) stated in relevant part that "[a] resigned Equity Members shall not be entitled to use the Club Facilities *after his or her resignation."* (emphasis added). (T. at 44-48).

**{¶14}** In 1992, the original Code of Regulations was changed during a general membership and board meeting. As a result of this meeting, certain portions of Glenmoor's Code of Regulations were amended and changed, effective November 24, 1992. The 1992 Code of Regulations modified a resigning member's right to use the Club's facilities after resignation. Article X, Section 8(d) of the Code of Regulations was

changed in 1992 to state in relevant part that "[a] resigned member shall not be entitled to use the Club Facilities *after his or her membership has been repurchased."* (emphasis added). (T. at 48-52, 54-55).

**{¶15}** Both the 1990 and the 1992 Code of Regulations provided that every fourth membership issued be a resigned membership provided that the category membership desired by the new purchaser is available for membership. (T. at 74).

**{¶16}** Mr. Ricker further testified that nothing in the Code of Regulations or the Membership Plan allowed the board of governors or the president to modify the Code of Regulations on their own, without a general membership meeting and a vote by the board. (T. at 55-58).

**{¶17}** Finally, Mr. Ricker testified that in 2004 or 2005, a letter from the club president was sent to the club members stating that the Club was reverting back to the original policy: members would still be required to pay dues, which would accrue against their equity, up until their memberships are repurchased, but they would not be allowed to use club facilities after resignation. (T. at 58-60).

**{¶18}** He further explained that if a member, like himself, submitted their resignation prior the effective date of this letter, they were "grandfathered" in under the rules contained in the 1992 Code of Regulations. (T. at 60-61, 62-63, 65).

**{¶19}** Gretchen Fernandez testified that she has been the membership director for the past seven years. (T. at 90). She stated that she is responsible for recruiting new members to join the club. (T. at 114). She testified that the membership application she provides to prospective members consists of one page, front and back, and states "[t]he undersigned agrees to conform to and be bound by the Bylaws and Rules and

Regulations of the Club, as they may be amended from time to time." (T. at 119). She stated that when a new member joins the club, she explains to them that they would not be permitted to use the club facilities after resignation. (T. at 131). She further stated, that upon request for a copy of the club's bylaws, she provides the 1992 Code of Regulations which states that they are permitted to use the club facilities up until the time their membership is repurchased. (T. at 131-132). She stated that since 2005, she has sold five equity and fifty-three non-equity golf memberships. (T. at 93).

{¶20} Ms. Fernandez stated that she also deals with questions from current members concerning things such as billing and upcoming social events as well as inquiries concerning the resignation process. *Id.* She recalled that Mr. Caley contacted her in 2007 about resigning his membership. (T. at 124). She stated that in response to his inquiry, she sent him a copy of his membership application and the club bylaws. (T. at 125). She further stated that he did not contact her again concerning his resignation, and that he did not resign his membership in 2007. (T. at 126).

{¶21} Ms. Fernandez further testified that she is aware that there is a discrepancy between the 1992 Code of Regulations and the Membership Plan as set forth in 1990. (T. at 94). She stated that when a current member or a prospective member requests a copy of the by-laws or code or regulations, she provides them with the 1992 version which states that "a resigned member shall not be entitled to use Club Facilities after his or her membership has been repurchased." She admitted that was not an accurate statement of the Club's current policy, which is to deny members the use of the facilities after resignation. (T. at 105, 106).

{¶22} The trial court also heard testimony from Ronald Caley and Mark Gehring. Each testified about their recollection of joining the Club. Mr. Caley testified that he and his wife were invited to attend an orientation at the Club with Joe Ostrowske and his wife. (T. at 145-146). Prior to this time, the Caleys and the Ostrowskes were members at Prestwick Country Club. (T. at 169). At the orientation, they were given a tour of the facilities, including the golf course, the locker rooms and the different restaurants. He recalled that it was at that orientation dinner that they were approached by Myron Vernis, the Club's general manager. (T. at 147). Mr. Caley testified that he asked Mr. Vernis to explain the difference between the equity and non-equity memberships, because he was interested in playing golf. (T. at 148). He stated that he was told that the purchase of an equity membership allowed for the return of 80% of the value or 100% of what you invested, upon resignation from the club. (T. at 148-149, 152). He claims that he was never told that if he resigned his membership that he would be placed on a waiting list, that only one membership was repurchased for every four (4) new memberships sold, or that he would not be able to use the club facilities while waiting for his membership to be repurchased. (T. at 150, 153). He further stated that he was never given a copy of the Club's Bylaws/Code of Regulations or Membership Plan. (T. at 154). He further admitted that he never requested a copy of such documents. (T. at 186). Mr. Caley also testified that while he would characterize his membership as a "family membership", he paid his membership dues and club charges with his corporate checking account and that when he applied for membership, he checked the box marked corporate. (T. at 157-158, 176). Mr. Caley also testified that he did make an inquiry into the resignation process on or about October, 2007, but that

he was not ready to resign at that time. (T. at 165). He admitted that the documents he received from Ms. Fernandez in 2007 spelled out the terms of the resignation process. (T. at 189).

**{¶23}** During Mark Gehring's testimony, he admitted that the membership application he signed upon joining stated that he was bound by the ByLaw and Rules and Regulations of the club. (T. at 231-233). He also admitted that he never requested a copy of the bylaws or inquired further about same. (T. at 233). He further admitted that the application he signed stated that upon resignation by a member, the Club must resell the membership before the refund can be issued. (T. at 234). Mr. Gehring testified that he tendered his letter of resignation to the Club on October 3, 2011. (T. at 237). Mr. Gehring admitted that during his club membership, he frequently fell behind on his dues. (T. at 222). He stated that he was suspended or threatened with suspension from club facilities based on such delinquencies. (T. at 224). He admitted that at the time of resignation, he owed the club approximately $4,700 on account. (T. at 220-221, 238).

**{¶24}** Myron Vernis testified he has been the general manager of the Club for the last twenty years. (T. at 248, 271). He explained that the Club is governed by a set of documents collectively known as the Membership Plan which includes the Code of Regulations, sometimes referred to as Bylaws. (T. at 249-250). Mr. Vernis testified that the most recent version of the Code of Regulations, the 1992 version, states that a resigned member shall not be entitled to use the club facilities after his or her membership is *repurchased*. (T. at 251). He further testified that such is not a correct statement of the current policy of the Club which prohibits a member from using the club

after resignation. (T. at 251-252). He admitted that prospective members are not given a copy of the Membership Plan. (T. at 254). Mr. Vernis testified that the Club changed its policy back to the original 1990 policy in the mid 2000's, around 2004. (T. at 285, 310). He testified that such policy change was enacted by Mr. Wolstein, the current owner of the Club, without a vote by the members. (T. at 286-287, 310).

{¶25} The trial court also heard brief testimony from Aaron Schaeffer, the assistant controller of the Club. He testified that he has worked in the controller's office for six years. (T. at 315). Mr. Schaeffer testified that as of the end of the third quarter, the Gehrings owed the Club $4,774.95. (T. at 325). He further testified that the Club records indicate the Gehrings had been suspended on seven occasions during the tenure at the Club. (T. at 319).

{¶26} In addition to the above live testimony, the trial court was also presented with the deposition testimony of Anthony Spitale, who has served as Glenmoor's Controller since November, 1998. Mr. Spitale, testified by deposition that when he receives notice from the Membership Director that an equity member has resigned, he removes all codes from the system so the resigned member cannot use club facilities or incur any additional charges, adjusts the resigned member's charges, issues a final statement, and places the resigned equity member on a "repayment list" which he maintains on his computer. He explained that Glenmoor repurchases the equity membership at the top of the resignation list once the Club receives the equivalent of four equal membership initiation fees from new members. Thus, once the Club has an amount equal to four equity memberships, it repurchases one membership from a resigned member. Resigned members are still charged quarterly dues, which Mr.

Spitale keeps track of but does not bill immediately to the resigned member. These dues amount to approximately $6,500 per year. Because the resigned members on the resignation list continue to be charged dues, the amount that the resigned member receives once he or she reaches the top of the equity resignation list is reduced quarterly. The length of time members must wait on the list has, as a practical matter, been so long that most of the resigned members never receive any of their equity initiation fee back because it is completely depleted before they reach the top of the resignation list. Glenmoor's Controller testified that a ten (10) year waiting period on the resignation list was typical in his experience. (Spitale Depo. Tr., p. 18, lines 3-9).

{¶27} On December 17, 2012, the trial court issued a Judgment Entry awarding $30,000 to the Caleys and $30,000 to the Gehrings. The trial court also awarded $4,774.95 to Glenmoor on its counterclaim against the Gehrings. Thus, the total award in favor of Appellees was $55,225.05.

{¶28} Glenmoor filed a timely Notice of Appeal on January 16, 2013; Appellees cross-appealed. The trial court then issued a Nunc Pro Tunc Judgment Entry to address claims which had not been resolved by the court's original December 17, 2012, Judgment Entry. Glenmoor filed a second timely Notice of Appeal on January 29, 2013. Appellees again cross-appealed. Upon Glenmoor's Motion, this Court consolidated the two appeals on April 14, 2013.

{¶29} Appellant now appeals, and Appellee cross-appeals, from the trial court's December 17, 2012, Judgment Entry, raising the following Assignments of Error:

## ASSIGNMENTS OF ERROR

{¶30} "I. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT SUA SPONTE AMENDED THE PLEADINGS TO INCLUDE THE DEFENSE OF ILLEGAL CONTRACT BASED ON UNCONSCIONABILITY.

{¶31} "II. THE TRIAL COURT ERRED AS A MATTER OF LAW IN FINDING THE PARTIES' CONTRACT UNCONSCIONABLE.

{¶32} "III. THE TRIAL COURT ERRED IN FINDING THAT GLENMOOR BREACHED THE PARTIES' ORAL AND WRITTEN CONTRACT.

{¶33} "IV. THE TRIAL COURT ERRED IN FINDING THAT THE CONTRACT WAS BOTH UNCONSCIONABLE AND BREACHED.

{¶34} "V. THE TRIAL COURT ERRED IN FINDING THE EXISTENCE OF AN ORAL AND WRITTEN CONTRACT WITH CONFLICTING TERMS."

{¶35} Appellees have filed a cross-appeal, raising the following Assignments of Error:

## CROSS-ASSIGNMENTS OF ERROR

{¶36} "I. THE TRIAL COURT ERRED AS A MATTER OF LAW IN RULING AGAINST PLAINTIFFS/APPELLEES ON THEIR CLAIM FOR VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT.

{¶37} "II. THE TRIAL COURT ERRED AS A MATTER OF LAW IN RULING AGAINST PLAINTIFFS/APPELLEES ON THEIR CLAIM FOR NEGLIGENT MISREPRESENTATION."

{¶38} For ease of discussion, we will address some of Appellant's Assignments of Error out of order.

**I., II.**

{¶39} In its First and Second Assignments of Error, Appellant Glenmoor argues that the trial court erred in making a finding of Unconscionability in this matter. We agree.

{¶40} Under Ohio law, a contract clause is unconscionable where there is the absence of meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to the other party. *Collins v. Click Camera and Video, Inc.,* 86 Ohio App.3d 826, 834, 621 N.E.2d 1294 (2nd Dist 1993).

{¶41} Unconscionability embodies two separate concepts: (1) substantive unconscionability, i.e. "those factors which relate to the contract terms themselves and whether they are commercially reasonable," and procedural unconscionability, i.e. "those factors bearing on the relative bargaining position of the contracting parties." *Id.* In *Collins,* the court explained the difference between the two concepts as follows:

{¶42} "Substantive unconscionability involves those factors which relate to the contract terms themselves and whether they are commercially reasonable. Because the determination of commercial reasonableness varies with the content of the contract terms at issue in any given case, no generally accepted list of factors has been developed for this category of unconscionability. However, courts examining whether a particular limitations clause is substantively unconscionable have considered the following factors: the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future liability.....

{¶43} "Procedural unconscionability involves those factors bearing on the relative bargaining position of the contracting parties, e.g., 'age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question.' " *Id.* at 834, 621 N.E.2d 1294. (Citations omitted).

{¶44} The issue of unconscionability is a question of law. *See Ins. Co. of North Am. v. Automatic Sprinkler Corp.,* 67 Ohio St.2d 91, 98, 423 N.E.2d 151 (1981).

{¶45} The "basic test of unconscionability of contract is whether under circumstances existing at the time of making of contract and in light of general commercial background and commercial needs of particular trade or case, clauses involved are so one-sided as to oppress or unfairly surprise the other party." Black's Law Dictionary (5 Ed.Rev.1979) 1367.

{¶46} The party asserting unconscionability of a contract bears the burden of proving that the agreement is both procedurally and substantively unconscionable. *See generally Ball v. Ohio State Home Servs., Inc.,* 168 Ohio App.3d 622, 2006-Ohio-4464, 861 N.E.2d 553, ¶ 6; *see also Click Camera,* 86 Ohio App.3d at 834, 621 N.E.2d 1294, citing White & Summers, Uniform Commercial Code (1988) 219, Section 4–7 ("One must allege and prove a 'quantum' of both prongs in order to establish that a particular contract is unconscionable").

{¶47} In the case sub judice, the issue of Unconscionability was never raised by either the Caleys or the Gehrings and was further not proven by the parties. No evidence was presented to establish either substantive or procedural unconscionability.

There was no evidence that Appellees lacked a meaningful choice or that they were in an unequal bargaining position in terms of the contract. There was no evidence of coercion or duress or that Appellees were pressured into signing the contract.

**{¶48}** While this Court finds that a discrepancy did exist between the current club usage policy following resignation and that set forth in the 1992 Code of Regulations, we do not find that such contradiction renders the contracts between Glenmoor and Appellees unconscionable.

**{¶49}** Appellant's First and Second Assignments of Error are sustained.

**III., IV. and V**.

**{¶50}** In its Third, Fourth and Fifth Assignments of Error, Appellant Glenmoor claims that the trial court erred in finding a breach of written and oral contracts. We agree in part and disagree in part for the following reasons.

Breach of Oral Contract

**{¶51}** "A written contract must be construed and interpreted from its four corners without consideration of parol evidence, *i.e.,* evidence that would contradict or vary the terms of the contract. The parol evidence rule bars the use of extrinsic evidence to contradict the terms of a written contract intended to be the final and complete expression of the contracting parties' agreement." *Meade v. Kurlas,* 12th Dist. No. CA2010-08-216, 2011-Ohio-1720.

**{¶52}** An oral agreement cannot be enforced in preference to a signed writing which pertains to exactly the same subject matter, yet has different terms." *Marion Prod. Credit Assn. v. Cochran* (1988), 40 Ohio St.3d 265, 533 N.E.2d 325, paragraph three of the syllabus.

**{¶53}** At trial, a great deal of testimony was presented  by Appellees in support of their claims that the Club, through Myron Vernis, orally represented to them that upon resignation they would receive a refund of their $30,000 initiation fee. Appellees contend that such representations do not accurately reflect the terms of the written contract they entered into with Glenmoor.

**{¶54}** Here, Appellees each entered into a written membership contract with Glenmoor.  Such written contract addresses how and when a member will receive a refund of his initiation fee upon resignation.

**{¶55}** When the terms of a contract are clear and unambiguous, a trial court may not go beyond the plain language of the agreement to determine the intent of the parties. *See Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241, 246, 374 N.E.2d 146 (1978).

**{¶56}** Here, the trial court made no finding, and upon review of the record we find no evidence, that the contract in this case was ambiguous.

**{¶57}** We therefore find that the trial court erred in finding the existence and subsequent breach of an oral contract in this matter.

Unconscionability

**{¶58}** We have previously found the trial court's finding of unconscionability in this matter to be erroneous.

Breach of written contract

**{¶59}** In order to succeed on a breach of contract claim, the plaintiff must demonstrate that: (1) a contract existed; (2) the plaintiff fulfilled his obligations; (3) the defendant breached his obligations; and (4) damages resulted from this breach. *Chaney*

*v. Ramsey,* 4th Dist. No. 98CA614, 1999 WL 217656, (Apr. 7, 1999), citing *Doner v. Snapp,* 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (2nd Dist.1994).

**{¶60}** " '[B]reach,' as applied to contracts is defined as a failure without legal excuse to perform any promise which forms a whole or part of a contract, including the refusal of a party to recognize the existence of the contract or the doing of something inconsistent with its existence." *Natl. City Bank of Cleveland v. Erskine & Sons, Inc.,* 158 Ohio St. 450, 110 N.E.2d 598 (1953), paragraph one of the syllabus.

**{¶61}** " 'When the facts presented are undisputed, whether they constitute a performance or a breach of a written contract, is a question of law for the court.' " *Koon v. Hoskins,* 4th Dist. No. 95CA497, 1996 WL 30018, (Jan. 24, 1996), fn. 5, quoting *Luntz v. Stern,* 135 Ohio St. 225, 20 N.E.2d 241 (1939), paragraph five of the syllabus.

**{¶62}** While Appellees make much of the fact that they claim to have had no knowledge of the terms of repurchase following resignation, the membership application clearly states that members will be bound by the Bylaws and Rules and Regulations of the Club. Nothing prevented Appellees, both successful business men, from seeking legal counsel to review the membership contract prior to joining. Appellees were sophisticated enough to appreciate the possibility of retaining counsel. Instead, Appellees both entered into such contract willingly and used the Club regularly for many years prior to their decision to resign their memberships.

**{¶63}** This Court has followed "the well-settled principle that a person who is competent to contract and who signs a written document without reading it is bound by its terms and cannot avoid its consequences." *Hook v. Hook* (1982), 69 Ohio St.2d 234, 238, 23 O.O.3d 239, 431 N.E.2d 667. According to the Ohio Supreme Court, the "legal

and commonsensical axiom that one must read what one signs survives" to this day. *ABM Farms,* 81 Ohio St.3d at 503, 692 N.E.2d 574. *See, also*, *McAdams v. McAdams* (1909), 80 Ohio St. 232, 240-241, 88 N.E. 542 ("A person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different from what he intended, when he could have known the truth by merely looking when he signed.").

{¶64} In the instant case, we find that the only term of the membership contract which was breached in this matter was that provision relating to whether a club member could or could not use the club facilities after tender of resignation and prior to repurchase of the membership by the club. This Court finds that the provision contained in the 1992 Code of Regulations is the controlling contract provision and that the Club breached its contract with Appellees by not allowing them to use the Club facilities until such time as their membership is repurchased or their equity is depleted.

{¶65} We therefore remand this matter to the trial court for a determination of damages for the breach of contract for the period of time Appellees were charged quarterly dues but were prohibited from using the club facilities.

{¶66} We further note that the damage calculation may be different for each set of Appellees in this matter, as Appellees Gehring resigned with an unpaid dues balance.

{¶67} Appellant's Third, Fourth and Fifth Assignments of Error are overruled in part and sustained in part.

## Cross-Appeal

### I.

{¶68} In their First Assignment of Error, Cross-Appellants assert that the trial court erred in denying their Consumer Sales Practices Act claims. We disagree.

{¶69} As set forth in R.C. Chapter 1345, the OCSPA defines "consumer transaction" as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." R.C. §1345.01(A). Although "individual" is not defined in this section, it is among several other classifications, including partnership and association, which are included in the definition of "person" in R.C. §1345.01(B): " 'Person' includes an individual, corporation, government, governmental subdivision or agency, business trust, estate, trust, partnership, association, cooperative, or other legal entity." In the absence of a statutory definition, we must apply the ordinary and common understanding of the term "individual." R.C. §1.42.

{¶70} Moreover, R.C. §1345.03 provides further illustration of the OCSPA's inapplicability to businesses or similar entities. That statute lists several factors to be considered in determining whether an unconscionable trade practice has occurred. R.C. §1345.03(B)(1) requires the court to consider whether the consumer has been taken advantage of because of "physical or mental infirmities, ignorance, illiteracy, or inability to understand the language." These criteria relate only to human beings and have no relevance to a business entity. Therefore, as used in R.C. §1345.01(A), "individual" means "natural person."

{¶71} Evidence was presented that Mr. Caley's membership contribution, dues and other charges associated with use of the club and its facilities were paid with checks drawn on his business, L.A. Copier Company, an Ohio corporation.

**{¶72}** Evidence was also presented that Cross-Appellant Caley considered his country club membership to be an investment opportunity in that the value of his membership could theoretically be worth more upon resignation than when he purchased it.

**{¶73}** Since Cross-Appellant purchased this membership as an investment, not for personal, family, or household purposes, the CSPA does not apply here.

**{¶74}** We therefore find that the trial court had competent, credible evidence to support its decision denying the CSPA claim herein.

**{¶75}** Cross-Appellant's First Assignment of Error is overruled.

**II.**

**{¶76}** In their Second Assignment of Error, Cross-Appellants claim that the trial court erred in denying their claims for negligent misrepresentation. We disagree.

**{¶77}** The doctrine of negligent misrepresentation provides recovery where: 1) a party who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, provides false information; 2) for the guidance of another party in its business transaction; 3) causing the other party to suffer pecuniary loss; 4) as a result of justifiable reliance on the information; 5) if the one providing the information failed to exercise reasonable care or competence in obtaining and communicating the information. *Delman v. City of Cleveland Hts.,* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835.

**{¶78}** The trial court found that Cross-Appellants failed to establish the element of "false information". We agree with the trial court.

{¶79} While Cross-Appellants claim that they believed that Glenmoor would refund their $30,000 equity membership initiation fees immediately upon their resignation, they failed to prove that any such statements or promises were in fact ever made to them.

{¶80} Cross-Appellants Second Assignment of Error is overruled.

{¶81} For the foregoing reasons, the judgment of the Court of Common Pleas of Stark County, Ohio, is affirmed in part, reversed in part and remanded for further proceedings consistent with the law and this opinion.

By: Wise, J.

Farmer, P. J., and

Baldwin, J. concur.

_____
HON. JOHN W. WISE

_____
HON. SHEILA G. FARMER

_____
HON. CRAIG R. BALDWIN

JWW/d 1024

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

RONALD P. CALEY, et al.                    :
                                           :
    Appellees/Cross-Appellants          :
                                           :
-vs-                                       :                JUDGMENT ENTRY
                                           :
GLENMOOR COUNTRY CLUB, INC.                :
                                           :
    Appellant/Cross-Appellee            :                Case Nos. 2013 CA 00012 and
                                           :                          2013 CA 00018


For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Stark County, Ohio, is affirmed in part, reversed in part and remanded for further proceedings consistent with his opinion.

Costs assessed to Appellant and Appellees equally.


_____
HON. JOHN W. WISE


_____
HON. SHEILA G. FARMER


_____
HON. CRAIG R. BALDWIN